UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF OHIO
WESTERN DIVISION

KIMBERLY EDELSTEIN,
Plaintiff,

Case No. 1:17-cv-305
Barrett, J.
Litkovitz, M.J.

vs.

JUDGE GREG STEPHENS, *et al.*,
Defendants.

**REPORT AND
RECOMMENDATION**

## I. Introduction

Plaintiff Kimberly Edelstein brings this action alleging violations of her rights under federal and state law by defendants Butler County, Ohio Common Pleas Judge Greg Stephens, Butler County Prosecutor Michael Gmoser, and Butler County Assistant Prosecutor Dan Ferguson. Plaintiff filed an amended complaint on July 21, 2017 (Doc. 20), which is the operative complaint in the lawsuit. Plaintiff brought 20 claims against defendants. The relevant facts of the amended complaint are summarized in the Report and Recommendation on defendants' motion for partial dismissal of the complaint (Doc. 22) dated February 16, 2018. (Doc. 31). The district judge adopted the Report and Recommendation in part and denied defendants' motion as to Counts I, VI, VII, VIII and XV. (Doc. 40).

The claims that remain pending before the Court are plaintiff's claims for injunctive relief (Count I); violation of plaintiff's First Amendment right to free exercise of her religion under 42 U.S.C. § 1983 against defendant Stephens (Count III); violation of plaintiff's Fourteenth Amendment right to equal protection of the law under § 1983 against defendant Stephens (Count V); violation of plaintiff's Fourteenth Amendment right to substantive due process under § 1983 against defendants Stephens, Gmoser, and Ferguson, respectively (Counts

VI, VII, VIII); unlawful termination based on religious discrimination in violation of Ohio Rev. Code §§ 4112.02 and 4112.99 against defendant Stephens (Count IX); defamation against defendant Stephens (Count XV); and intentional interference with a business relationship against defendant Gmoser (Count XIX). (Docs. 31, 40).

This matter is before the Court on the following summary judgment motions:

- Plaintiff's first motion for partial summary judgment on Counts VII, VIII and XIX of the amended complaint (Doc. 140), defendants' response (Doc. 148), and plaintiff's reply (Doc. 154);

- Plaintiff's second motion for partial summary judgment on Count VI of the amended complaint (Doc. 141), defendants' response (Doc. 148), and plaintiff's reply (Doc. 155); and

- Defendants' motion for summary judgment (Doc. 143), plaintiff's response (Doc. 149), and defendants' reply (Doc. 152).

## II. Summary judgment standard

A motion for summary judgment should be granted if the evidence submitted to the Court demonstrates that there is no genuine issue as to any material fact, and that the movant is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(c). *See Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986); *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247 (1986). Under Fed. R. Civ. P. 56(c), summary judgment should be granted if "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue of material fact and the moving party is entitled to judgment as a matter of law." All evidence, and all inferences drawn therefrom, should be construed in the light most favorable to the non-moving party. *Satterfield v. Tenn.*, 295 F.3d 611 615 (6th Cir. 2002) (citing *Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio*, 475 U.S. 574, 587 (1986)).

The function of the reviewing court is not to weigh the evidence and determine the truth of the matter, but to determine whether there is a genuine factual issue for trial. *Anderson*, 477

U.S. at 249. The court is not required to search the entire record for material issues of fact, *Street v. J.C. Bradford & Co.*, 886 F.2d 1472, 1479-80 (6th Cir. 1989), but the court must determine "whether the evidence presents a sufficient disagreement to require submission to a jury or whether it is so one-sided that one party must prevail as a matter of law." *Anderson*, 477 U.S. at 251-52. The party opposing summary judgment must "do more than simply show that there is some metaphysical doubt as to the material facts." *See Matsushita*, 475 U.S. at 586. The party opposing a motion for summary judgment "must make an affirmative showing with proper evidence" to defeat the motion. *Alexander v. CareSource*, 576 F.3d 551, 558 (6th Cir. 2009) (citing *Street*, 886 F.2d at 1479). "Speculation does not create a *genuine* issue of fact. . . ." *Hedberg v. Indiana Bell Tel. Co., Inc.*, 47 F.3d 928, 932 (7th Cir. 1995).

There is no genuine issue for trial if the record, considered as a whole, could not lead a reasonable jury to find for the non-moving party. *Nilles v. Givaudan Flavors Corp.*, 521 F. App'x 364 (6th Cir. 2013) (citing *Matsushita*, 475 U.S. at 587). "When opposing parties tell two different stories, one of which is blatantly contradicted by the record, so that no reasonable jury could believe it, a court should not adopt that version of the facts for purposes of ruling on a motion for summary judgment." *Scott v. Harris*, 550 U.S. 372, 380 (2007). Facts that are not blatantly contradicted by the record "remain entitled to an interpretation most favorable to the non-moving party." *Coble v. City of White House, Tenn.*, 634 F.3d 865, 870 (6th Cir. 2011). In addition, the court "must disregard all evidence favorable to the moving party that the jury is not required to believe." *Reeves v. Sanderson Plumbing Prods., Inc.*, 530 U.S. 133, 151 (2000) (citation omitted). It is the jury's function, not the function of the court, to make credibility determinations, weigh evidence, and draw legitimate inferences from the facts. *Id.* at 150 (citing *Anderson*, 477 U.S. at 255).

It is not necessary that the submissions of a party opposing summary judgment be in a form that is admissible at trial, but a party must present "enough evidence that will be admissible at trial to demonstrate that a genuine issue on a material fact exists." *Alexander*, 576 F.3d at 558; *see also* Fed. R. Civ. P. 56(c)(1)(A), (4) (requiring an affidavit or declaration to "set out facts that would be admissible in evidence"). An affidavit used to support a motion for summary judgment must be "made on personal knowledge, set out facts that would be admissible in evidence, and show that the affiant . . . is competent to testify on the matters stated." Fed. R. Civ. P. 56(c)(4). Affidavits that simply repeat vague and conclusory allegations from the complaint are not sufficient to create a genuine issue of material fact. *Emmons v. McLaughlin*, 874 F.2d 351, 358 (6th Cir. 1989).

The court cannot consider hearsay evidence not subject to any exception when deciding a summary judgment motion. *Alexander*, 576 F.3d at 558 (citation omitted). Hearsay evidence includes a statement that is not made by the declarant while testifying at trial or hearing and that is offered in evidence to prove the truth of the matter asserted. Fed. R. Evid. 801(c). An opposing party's statement that is offered against the party is not hearsay if it meets certain conditions, including if the opposing party "manifested that it adopted [the statement] or believed [the statement] to be true"; the statement "was made by a person whom the party authorized to make a statement on the subject"; or the statement "was made by the party's agent or employee on a matter within the scope of that relationship and while it existed." Fed. R. Evid. 801(d)(2). This Court has held that if properly authenticated and offered against the opposing party, "internet chat logs containing [the opposing party's] statements" are admissible as non-hearsay evidence. *U.S. v. Edington*, No. 2:10-cr-335, 2011 WL 13130880, at *3 (S.D. Ohio Apr. 12, 2011).

4

## III. Disputed and undisputed facts

The parties agree on some relevant facts, but many of the facts that are material to the resolution of the parties' motions are disputed. The parties' versions of the facts are set forth below. The facts are undisputed except where noted.

Plaintiff was employed as a staff attorney/magistrate in the Butler County, Ohio Court of Common Pleas for Judge Patricia Oney for approximately nine years. Defendant Judge Stephens hired plaintiff as a staff attorney/magistrate position when he assumed Judge Oney's former position on March 14, 2016. (Stephens Aff., Doc. 126-10, ¶¶ 2, 8[1]). Plaintiff was an at-will employee who served at the pleasure of Judge Stephens. (Id., ¶ 8).

On Thursday, July 28, 2016, Edelstein told Stephens she would need to take eight, non-consecutive days off in October 2016 for the Jewish High Holy Days. (Id., ¶ 22).[2] Stephens responded by exclaiming, "Holy Cow!" (Id.). Plaintiff asserts that Stephens "yelled" at her, "Holy Cow, eight days!" (Plaintiff Aff., Doc. 141-5, ¶¶ 3, 4). Plaintiff alleges it was clear to her that Stephens was angry because he was frowning and yelling at her, and this was the first and only time he had yelled at her. (Id., ¶ 4). Plaintiff alleges that Stephens then "calmed down" after she explained the days were work-restricted and she had taken them off for nine years without a problem from Judge Oney, and he then waved dismissively at her and said "fine." (Id., ¶¶ 9-10; Plaintiff Depo. I, Doc. 131 at 31). Stephens told plaintiff to email his bailiff, Jamie

---

[1] Stephens's affidavit was submitted to the EEOC in connection with an administrative complaint plaintiff filed against him.

[2] Stephens states in his EEOC affidavit that plaintiff made the request on July 27, 2016 and sent an email to Barger and him; he detected tension among his staff "[l]ater that day"; the tension still seemed evident the next morning, which would be July 28; at that point, he decided his personal staff could no longer operate that way and he would speak with Court Administrator Gary Yates about terminating plaintiff; and he spoke with Yates the next morning, July 29, which would be two days after her request. (Doc. 126-10, ¶¶ 22, 27, 29, 32). However, defendant has clarified in his summary judgment briefs that plaintiff requested time off on July 28, 2016, a Thursday, and he spoke to Yates the same day he saw that the tension had persisted, which was Friday, July 29, in the morning. (Doc. 143 at 7; Doc. 152 at 5).

Wilson, and Stephens's judicial assistant, Melinda Barger, the days she would be off, which plaintiff did immediately. (Pltf. Depo. I, Doc. 131 at 31). Plaintiff sent an email to Stephens and Barger informing them of the days she would be off on Thursday, July 28, 2016 at 1:52 p.m. (*Id.*; Stephens Aff., Doc. 126-10, Exh. 2).

Defendant Stephens alleges that later in the day after this conversation, he observed strife among his personal staff. (Stephens Aff., Doc. 126-10, ¶¶ 27-31). Stephens asserts "the tension still seemed evident the next morning, and [he] noticed [plaintiff's] door was closed." (*Id.*, ¶ 29). The parties disagree as to who the source of the stress was. According to Stephens, "Ms. Barger reported that Ms. Edelstein was only communicating with her by email, seemingly trying to avoid direct communication. Ms. Barger also told me that Ms. Edelstein walked by her and avoided looking at her, holding up a file to block her view of Ms. Barger." (*Id.*, ¶¶ 30, 31). According to plaintiff, Barger stopped talking to plaintiff after she requested the time off and emailed the staff about it. (Pltf. Aff., Doc. 141-5, ¶ 12; Pltf. Depo. I, Doc. 131 at 82-83).

Stephens made the decision to terminate plaintiff almost immediately after her request and took steps toward doing so the following morning, Friday, July 29. According to Stephens, when he saw that the tension among his staff persisted the morning after plaintiff's request, he decided "[his] personal staff could no longer operate that way and decided to speak with the Court Administrator, Gary Yates, about terminating Ms. Edelstein." (Stephens Aff., Doc. 126-10, ¶ 32). On July 29, Stephens spoke with Yates about terminating plaintiff. (*Id.*; Doc. 141, Exh. 4). At 3:23 p.m. on Friday, July 29, Stephens emailed Yates and informed Yates that he "anticipate[d] letting her go" after she finished the magistrate's docket on August 1, 2016. (Doc. 141, Exh. 4, Stephens's 7/29/2016 3:23 p.m. email to Yates). Stephens asserts he met with Barger and Wilson on Monday, August 1, "[a]fter that weekend passed and [he] had made the

decision to terminate" plaintiff in order "to gather their input on the decision." (Stephens's Official Capacity Interrogatory Responses (OC ROGs), Doc. 126-10, No. 2). Plaintiff alleges the meeting occurred "after lunch" and lasted over two hours.[3] (Doc. 141-5, ¶ 15).

On Monday, August 1, 2016, Stephens terminated plaintiff. Stephens went to plaintiff's office that morning with Barger as a witness and told plaintiff she was being terminated. (Stephens Aff., Doc. 126-10, ¶ 35). Stephens alleges he told plaintiff she was being terminated because of personality conflicts between her and the rest of his personal staff and her "persistent arguing and combative attitude with him." (Id., ¶¶ 35-36; Stephens OC ROGs, Doc. 126-10, No. 3; Stephens Official Capacity Requests for Admissions (OC RFAs), Doc. 126-8, No. 6; Stephens Individual Capacity Interrogatory Responses (IC ROGs), Doc. 126-9, No. 15). Elsewhere Stephens claims that he told plaintiff she was not working out because "she was not gelling with the rest of the staff," and when plaintiff disputed his reason he said he "was not going to discuss it further." (Stephens Aff., Doc. 126-10, ¶ 35). Plaintiff alleges that Stephens told her she did not "fit in" and she had to pack her desk and leave by noon. (Pltf. Depo. I, Doc. 131 at 173; Pltf. Aff., Doc. 141-5, ¶ 17). Plaintiff further alleges that when she asked both Stephens and Barger what they meant by "fit in," neither responded. (Pltf. Depo. I, Doc. 131 at 115-117). The termination letter Stephens sent to plaintiff gave no reason for the termination. (Doc. 149-1, Pltf. Aff., ¶ 7; Id., Exh. 2).[4]

---

[3] It is not clear from plaintiff's affidavit statement whether she is referring to the afternoon of July 28 or after lunch on July 29.

[4] The facts relating to plaintiff's substantive due process claim against defendants Gmoser and Ferguson and intentional interference with a business relationship claim against defendant Gmoser will be addressed *infra* in connection with these claims.

## IV. The parties' entitlement to summary judgment on the pending claims

### A. First Amendment right to free exercise of plaintiff's religion (Count III)

Plaintiff brings a claim against defendant Stephens under 42 U.S.C. § 1983 for violation of her First Amendment right to freely exercise her religion. (Doc. 20, ¶¶ 76-85). Plaintiff alleges that Stephens terminated her employment on or about August 1, 2016, because she attempted to exercise her right to practice her deeply-held religious beliefs by taking eight non-consecutive days of leave from work to observe the Jewish High Holy Days.

Defendant Stephens moves for summary judgment on plaintiff's First Amendment claim. (Doc. 143). Stephens does not dispute that the first two elements of a First Amendment claim are satisfied as (1) plaintiff engaged in constitutionally-protected activity, and (2) plaintiff was terminated. (*Id.* at 5). However, Stephens contends plaintiff's claim fails because there is no causal connection between the two events. (*Id.*). Stephens alleges there is no dispute that plaintiff was terminated three days after she requested and received permission to take time off for the Jewish holidays in October 2016. (*Id.*, citing Pltf. Depo. I, Doc. 131 at 29; Am. Complt., Doc. 20, ¶¶ 78-79). Stephens argues, though, that the close temporal proximity cannot suffice to establish a retaliatory motive on his part. (*Id.* at 5-6, citing *Skinner v. Bolden*, 89 F. App'x 579, 579-80 (6th Cir. 2004); *Smith v. Campbell*, 250 F.3d 1032, 1038 (6th Cir. 2001); *King v. Zamiara*, 680 F.3d 686, 695 (6th Cir. 2012)). Stephens argues that the undisputed facts show he would have taken the same action in the absence of plaintiff's protected conduct, and he is therefore entitled to summary judgment on plaintiff's First Amendment claim. (*Id.* at 7, citing *Thaddeus-X v. Blatter*, 175 F.3d 378, 386 (6th Cir. 1999)).

### 1. First Amendment law

A plaintiff may bring a claim under 42 U.S.C. § 1983 "against anyone who, under color

of state law, deprives a person of rights, privileges, or immunities secured by the Constitution or conferred by federal statute." *Wurzelbacher v. Jones-Kelley*, 675 F.3d 580, 583 (6th Cir. 2012) (citations omitted). Plaintiff brings a § 1983 claim premised on the allegation that Stephens terminated her employment in retaliation for plaintiff's exercise of her First Amendment right to practice her religion. To state a First Amendment retaliation claim, plaintiff must plead that (1) she engaged in conduct that is protected under the First Amendment; (2) the defendant took an adverse action against her "that would deter a person of ordinary firmness from continuing to engage in that conduct"; and (3) the defendant's "adverse action was motivated at least in part by the plaintiff's protected conduct." *Id.* at 583 (citing *Mezibov v. Allen,* 411 F.3d 712, 717 (6th Cir. 2005) (citing in turn *Thaddeus-X,* 175 F.3d at 394).

Plaintiff has the burden to show by a preponderance of the evidence that "the adverse action was motivated at least in part by the protected conduct." *King,* 680 F.3d at 694 (quoting *Thaddeus-X,* 175 F.3d at 399). A "motivating factor" is "one without which the action being challenged simply would not have been taken." *Holzemer v. City of Memphis,* 621 F.3d 512, 525 (6th Cir. 2010) (quoting *Greene v. Barber,* 310 F.3d 889, 897 (6th Cir. 2002)). The determination of a "[a] defendant's motivation for taking action against the plaintiff is usually a matter best suited for the jury." *Paige v. Coyner,* 614 F.3d 273, 282 (6th Cir. 2010) (citing *Harris v. Barnhorst,* 513 F.3d 503, 519-20 (6th Cir. 2008)).

Two factors are pertinent to whether a retaliatory motive existed: (1) whether the defendant knew of the protected conduct; and (2) whether the timeline of events, including temporal proximity between the protected activity and the adverse action, supports an inference of causation. *Bright v. Gallia County, Ohio,* 753 F.3d 639, 653-54 (6th Cir. 2014) (citing *Handy-Clay v. City of Memphis,* 695 F.3d 531, 545-46 (6th Cir. 2012); *King,* 680 F.3d at 695;

*Paige,* 614 F.3d at 282-83). The chronology of events can support an inference of causation which satisfies the third factor of a First Amendment retaliation claim. *Handy-Clay,* 695 F.3d at 546. More specifically, the temporal proximity between protected conduct and retaliatory acts alone can be sufficient to create an inference of retaliatory motive. *King,* 680 F.3d at 695-96 (citing *Paige,* 614 F.3d at 282-83; *Muhammad v. Close,* 379 F.3d 413, 417-18 (6th Cir. 2004)).

"Where an adverse employment action occurs very close in time after an employer learns of a protected activity, such temporal proximity between the events is significant enough to constitute evidence of a causal connection for the purposes of satisfying a prima facie case of retaliation." *Dye v. Office of the Racing Comm'n,* 702 F.3d 286, 305-06 (6th Cir. 2012) (quoting *Mickey v. Zeidler Tool & Die Co.,* 516 F.3d 516, 525 (6th Cir. 2008)). However, "where some time elapses between when the employer learns of a protected activity and the subsequent adverse employment action, the employee must couple temporal proximity with other evidence of retaliatory conduct to establish causality." *Id.* (quoting *Mickey,* 516 F.3d at 525).

The Sixth Circuit has held that a lapse of two to three months is sufficient to satisfy the causal connection prong of a retaliation claim. *Dye,* 702 F.3d at 305-06 (citing *Seeger v. Cincinnati Bell Tel. Co.,* 681 F.3d 274, 283 (6th Cir. 2012) ("nearness in time" between return from FMLA leave and termination - three weeks after employee's reinstatement and less than two months after he first notified the employer of his medical leave - "suffices in these circumstances to meet the low threshold of proof necessary to establish a prima facie case of retaliatory discharge"); *Bryson v. Regis Corp.,* 498 F.3d 561, 571 (6th Cir. 2007) (three months held to be sufficient to establish causal connection based on temporal proximity because "a plaintiff's burden in establishing a prima facie case is not intended to be an onerous one") (internal quotation marks and alterations omitted); *Singfield v. Akron Metro. Housing Auth.,* 389

F.3d 555, 563 (6th Cir. 2004) (lapse of three months sufficient to show a causal connection)).
*See also Paige*, 614 F.3d at 282-83 (one week lapse between the protected conduct and the
adverse action created an inference of retaliatory motive); *Handy-Clay*, 695 F.3d at 546 (strong
inference of causation arose where the plaintiff was terminated the day after she engaged in the
protected conduct) (citing *Holzemer*, 621 F.3d at 526).

Where the temporal proximity between the protected conduct and the adverse action is
not "extremely close" so as to permit an inference of retaliatory motive, the Sixth Circuit often
requires evidence in addition to temporal proximity to permit the inference of an improper
motive. *Holzemer*, 621 F.3d at 526 (quoting *Vereecke v. Huron Valley Sch. Dist.*, 609 F.3d 392,
401 (6th Cir. 2010)). However, where the temporal proximity is close and the employer has
knowledge of the protected conduct, it is for the jury to decide whether a plausible rationale
offered by the employer for the termination is the actual reason or whether the true reason for the
termination was retaliation. *Bright*, 753 F.3d at 654.

If plaintiff makes a prima facie showing, the defendant must "show[] by a preponderance
of the evidence that it would have reached the same decision . . . even in the absence of the
protected conduct." *Mt. Healthy City Sch. Dist. Bd. of Educ. v. Doyle*, 429 U.S. 274, 287 (1977);
*Sowards v. Loudon Cty.*, 203 F.3d 426, 431 n.1 (6th Cir. 2000) ("[I]n a First Amendment
retaliation case, once a plaintiff shows that her constitutionally protected conduct was a
substantial factor in an adverse employment decision, the burden of persuasion shifts to the
defendant" to make this showing).

### 2. *Plaintiff's prima facie case*

There is no dispute that the first two factors of a First Amendment retaliation claim are
satisfied here. (*See* Doc. 143 at 5). First, plaintiff engaged in protected activity by requesting

time off from work to observe the Jewish High Holy Days. Second, plaintiff suffered an adverse action when her employment was terminated. Thus, the question to be resolved is whether plaintiff has produced evidence "that would allow a jury to find that [Stephens] was motivated at least in part by" plaintiff's protected conduct. *See Bright*, 753 F.3d at 653-54 (citing *Paige*, 614 F.3d at 282). In making this determination, the Court cannot resolve credibility issues, which is the role of the jury. *Maxey v. State Farm Fire and Cas. Co.*, 689 F. Supp. 2d 946, 952 (S.D. Ohio 2010) (citing *Adams v. Metiva*, 31 F.3d 375, 378 (6th Cir. 1994)).

To carry her burden on the third element of her prima facie case, plaintiff relies on the extremely close temporal proximity between her request for time off to observe the Jewish High Holy Days and her termination. Defendant Stephens argues there is no causal connection between plaintiff's leave request and her termination. (Doc. 143 at 5; Doc. 152 at 3-6). Stephens contends that under well-settled Sixth Circuit law, "unless the adverse employment action <u>immediately follows</u> the protected activity at issue, temporal proximity alone is insufficient to demonstrate causation in a retaliation case." (Doc. 152 at 3, citing *Mickey*, 516 F.3d at 525-26) (emphasis added by defendants). Defendant alleges that the Sixth Circuit has consistently followed *Mickey's* rationale: i.e., where temporal proximity is extremely close (as in that case, where the employer received notice of the protected activity and terminated the employee on the same day), temporal proximity is at least prima facie evidence of causation because it would be impossible for plaintiff to cite other evidence of retaliation between the time of the protected conduct and the termination. (*Id.* at 3-4, citing *Mickey*, 516 F.3d at 525-26). Stephens alleges the rationale does not apply here because "[h]e did not come to the decision [to terminate plaintiff] in a matter of hours; it took him [four] days to ultimately act on a decision he had been contemplating for months" due to internal conflicts between plaintiff and him and

plaintiff and other members of his staff and alleged reports from Barger of problems she had working with plaintiff. (Doc. 152 at 5). Stephens alleges that events occurring both before and after plaintiff's protected activity led to the decision. (*Id.*). Stephens argues that his failure to write up plaintiff for these issues does not mean they did not occur. (*Id.*, citing Doc. 149 at 5). Stephens argues his position is buttressed by affirmative evidence of the sequence of events, which shows he received reports that negatively impacted his impression of plaintiff; he noticed tension among his staff that persisted from the time he spoke with plaintiff on Thursday until Friday; he spoke with Yates about his concerns and considerations; and he thought about his decision over the weekend. (*Id*).

Plaintiff has satisfied her burden to produce evidence which would allow a reasonable jury to find that Stephens's decision to terminate her was motivated at least in part by her protected conduct. Under the circumstances of this case, temporal proximity alone is sufficient to carry plaintiff's burden on the third element. Stephens took steps to terminate plaintiff almost immediately after she requested time off for the Jewish High Holy Days. Plaintiff made her leave request around lunchtime on Thursday, July 28, 2016. Stephens spoke with Yates the next morning, July 29, about terminating plaintiff, which was no more than 24 hours after plaintiff had asked for time off to observe the Jewish High Holy Days. (Stephens Aff., Doc. 126-10, ¶ 32; Doc. 143 at 7). Stephens informed Yates the afternoon of Friday, July 29, that he had decided to terminate plaintiff after the magistrate's docket on Monday, August 1. (Doc. 141, Exh. 4). Stephens "gave the matter more thought over the weekend." (Stephens Aff., Doc. 126-10, ¶ 34). Stephens asserts that when "he still wished to terminate" plaintiff on Monday - four days after her request for time off - he met with Barger and Wilson to "gather their input on his decision" and went to plaintiff's office and terminated her. (Doc. 152 at 5). Stephens terminated

plaintiff's employment on Monday morning, August 1, as he had told Yates the previous Friday he planned to do. (Stephens Aff., Doc. 126-10, ¶ 35). Thus, by Stephens' own account, the temporal proximity is extremely close. At most, less than four full days, two of which were weekend days, elapsed between plaintiff's protected activity and her actual termination. Far less time - less than one full day - passed after plaintiff made her request and Stephens decided to take the first step toward terminating plaintiff, which was to speak with Yates about it.

In arguing that the temporal proximity is not close enough to establish the third element of plaintiff's prima facie case, Stephens acknowledges the rationale underlying the decision in *Mickey*. Defendant argues that unless the adverse employment action "immediately follows" the protected activity, temporal proximity alone is insufficient to establish causation. Stephens contends that the more time that passes between the protected activity and the adverse action, the greater the chance some other event will occur that motivates the adverse action. (Doc. 152 at 3, citing *Mickey*, 516 F.3d at 525-26). However, defendant misapplies that rationale to the undisputed facts of this case.

First, defendant disputes plaintiff's allegation that he decided to terminate her and "took concrete steps" to do so "between three and five work hours" after she requested eight days off to observe the Jewish High Holy Days. (Doc. 152 at 4, citing Doc.149 at 6-7). Stephens claims instead that he "considered terminating [plaintiff] *the day after* he granted her time off for the upcoming October" and that he "spoke with Gary Yates and other members of his personal staff about his inclinations that same day." (Doc. 152 at 4) (emphasis added). Stephens argues that it is inaccurate "to say that this occurred within 'three to five hours' following Stephens [sic] conversation" for two reasons: (1) he had considered terminating plaintiff for months because of internal conflicts between plaintiff and Stephens and other members of his personal staff; and (2) the evidence shows that "he would have made the same decision absent [plaintiff's] request for time

14

off." (Doc. 152 at 4-6). Neither reason proffered by defendant for reframing the temporal proximity between the two events is relevant to whether plaintiff has established the third prong of her prima facie case. The undisputed evidence supports a finding that defendant decided on Friday, July 29, 2016, the day after plaintiff's leave request, to terminate her the following Monday, August 1, 2016, and that defendant discharged plaintiff on that date as planned. Thus, only one day elapsed between plaintiff's protected activity and Stephens's decision to take the adverse action, and four days elapsed between the protected activity and the adverse action itself.

Further, although Stephens may have given some prior thought to terminating plaintiff as early as May 2016, whether he did so is not undisputed. (*See* Doc. 152 at 5; Doc. 143 at 6, citing OC ROGS, Doc. 126-10, Nos. 2, 6, 12; Stephens Aff., Doc. 126-10, ¶¶ 13, 15, 18; Doc. 142-1 at 5-8). Stephens has produced Facebook messages to show that he discussed a job position with Dan Gehr (Doc. 142-1 at 5-8), but that evidence does not unequivocally establish that Stephens discussed the possibility of Gehr taking plaintiff's job. And even assuming Stephens considered hiring Gehr to take plaintiff's place in early May 2016, there is no evidence that Stephens gave further consideration to terminating plaintiff *prior* to her leave request or that he ever took a step toward terminating plaintiff before that time. Rather, Stephens admits that he ultimately decided to give plaintiff more time after speaking with Gehr and that he hoped things would work out. (Stephens. Aff., Doc. 126-10, ¶ 18). Whatever thought Stephens may have given to terminating plaintiff, the undisputed evidence shows that he did not actually decide to terminate her and act on his decision until after she requested leave time to observe the Jewish High Holy Days. The extremely close temporal proximity between plaintiff's leave request and her termination is sufficient to create an inference of a causal connection.

Whether the temporal proximity between the protected activity and adverse action is construed as one day or four days, defendant has not offered a cogent explanation for why this very brief period of time is insufficient to establish an improper motive for purposes of establishing a prima facie case. The undisputed evidence shows that Stephens decided to terminate plaintiff no more than one work day after she requested time off for the Jewish High Holy Days. There is no evidence that Stephens ever wavered from his initial decision to terminate plaintiff. (Doc. 152 at 4). Stephens simply asserts that he gave the termination decision "more thought" over the two weekend days between plaintiff's request and her actual termination. (Stephens Aff., Doc. 126-10, ¶ 34). Stephens has not pointed to an intervening event that occurred over the weekend which could have produced an alternative motivation for the termination. Plaintiff requested leave on Thursday afternoon, Stephens made the decision the following day to terminate plaintiff, and Stephens followed through on his decision less than four full days and no more than two work days later on Monday, August 1. The Sixth Circuit has repeatedly recognized such a brief time period is sufficient to establish causation based on temporal proximity alone.

In short, plaintiff has come forward with sufficient evidence to establish a prima facie case of First Amendment retaliation based on her termination. In this situation, "where the adverse action comes directly on the heels of the protected activity," it is "nearly impossible to come up with other evidence that the adverse employment action was retaliatory." *See Montell v. Diversified Clinical Servs, Inc.*, 757 F.3d 497, 506 (6th Cir. 2014) (citing *Mickey*, 516 F.3d at 525). Under established Sixth Circuit law, the temporal proximity is sufficient to establish a causal connection between the protected activity and the termination.

### 3. Defendant's stated reason for the termination

Because plaintiff has satisfied her burden of production on the elements of her prima facie case, defendant must "show[] by a preponderance of the evidence that [he] would have reached the same decision . . . even in the absence of the protected conduct." *Mt. Healthy*, 425 U.S.at 287. Defendant alleges he has made the required showing and that he is entitled to summary judgment on plaintiff's First Amendment retaliation claim because he would have taken the same action in the absence of the protected activity. (Doc. 143 at 7). Stephens asserts that he granted every leave request plaintiff made, including her request for leave to observe the Jewish High Holy Days in October and her request in March or April for six days of leave for Passover. (Doc. 143 at 6-7, citing Stephens IC RFA, Doc. 126-7, No. 12; Stephens OC RFA, Doc. 126-8, No. 1; Stephens Aff., Doc. 126-10, ¶¶ 12, 22-25; Pltf. Depo. 1, Doc. 131 at 29). Stephens argues the "evidence is undisputed that [h]e decided to terminate [plaintiff] after once again witnessing and learning of internal strife between [plaintiff] and other members of his personal staff," and plaintiff offers no evidence to refute Stephens's evidence that he would have terminated her regardless of her request. (Doc. 152 at 6).

There are genuine issues of material fact as to whether Stephens terminated plaintiff for engaging in conduct protected under the First Amendment. First, plaintiff denies that she ever requested time off for the specific purpose of observing the Passover holiday at the start of her employment with Stephens. (Doc. 149 at 5-6, citing Pltf. Depo. I, Doc. 131 at 138-39). Plaintiff testified that she discussed with Stephens "two preplanned weeks" of leave that she had previously arranged to take and that he gave her permission to take the planned leave; however, she contends that she did not tell Stephens that one of the weeks was to observe Passover. (Pltf. Depo. I, Doc. 131 at 138-39). Further, while Stephens ostensibly gave plaintiff permission to

17

take eight days off in October for the Jewish High Holy Days, he effectively nullified his approval by terminating her only days later. Given the sequence of events, his initial affirmative response to her request is not evidence that Stephens would have terminated plaintiff even if she had not made the request.

Further, Stephens has not produced evidence that shows plaintiff was reprimanded for her behavior in the workplace or evidence which documents disruptive behavior in the workplace. Plaintiff asserts that she never had a conversation with Stephens about problems getting along with Barger or Wilson (Doc. 149-1, Plaintiff Aff., ¶ 2), she never had a conversation with Barger about communication issues or difficulties getting along with others (*Id.*, ¶ 3), and she had never been reprimanded by Stephens about any issues with her work or her relationship with other chambers' staff members. (Doc. 141-5, Pltf. Aff., ¶ 18). Stephens admits that he never gave plaintiff a verbal or written reprimand about her conduct in chambers. (Stephens OC RFA, Doc. 126-8, No. 5). He concedes that he never spoke to plaintiff about allegedly "butting heads" with or "barking orders" to Barger; he never witnessed or spoke to plaintiff about an alleged incident where she demanded the scheduling book from Barger; and he never spoke to plaintiff about closing her office door or asked her why she was closing it. (*Id.*, Nos. 9, 10, 14, 15, 17). A reasonable juror could infer from Stephens's failure to reprimand or discipline plaintiff that her termination was not based on her conduct in chambers or her inability to get along with Stephens's personal staff.

Further, the source of alleged internal strife among personnel in Stephens's chambers is disputed. Stephens admits that he lacked personal knowledge about intra-office strife, the reason he purportedly relied on for terminating plaintiff, and that he instead relied on information relayed to him by Barger. (Stephens OC RFA, Doc. 126-8, Nos. 9-14). Stephens concedes that

there was a "lack of communication on July 27, 2018 [between Barger and plaintiff], which seemed strained," but he had "no personal knowledge whether this situation resulted from a 'refusal' to speak on Plaintiff's part." (*Id.*, No. 11). Plaintiff has submitted affidavit evidence and testimony that she was not the source of strife among Stephens's personal staff but that Barger was the problem. (*See* Pltf. Aff., Doc. 141-5, ¶ 12; Pltf. Depo. I, Doc. 131 at 82-83, 113-14, 115-16). Defendant has not submitted an affidavit or testimony from Barger to refute plaintiff's allegation. A jury could disbelieve Stephens's highly vague and subjective reason for terminating plaintiff and find based on plaintiff's version of events that she did not cause tension in Stephens's chambers or create any other issues among defendant's personal staff. *Cf. Grano v. Dept. of Dev. of City of Columbus*, 699 F.2d 836, 837 (6th Cir. 1983) (quoting *Texas Dept. of Community Affairs v. Burdine*, 450 U.S. 248, 253 (1981)) (holding in the employment discrimination context that the articulated reasons for the adverse decision "must be 'clear and specific' to rebut the prima facie case and guarantee that the plaintiff will be afforded 'a full and fair opportunity' to demonstrate pretext."). *See also Kimble v. Wasylyshyn*, 439 F. App'x 492, 497 (6th Cir. 2011) (citing *Grano,* 699 F.2d at 837) ("[T]he legitimacy of the articulated reason for [an] employment decision is subject to particularly close scrutiny where the evaluation is subjective.").

### 4. Conclusion

There is no dispute that plaintiff engaged in conduct protected by the First Amendment, and Stephens took an adverse action against plaintiff that would deter a person of ordinary firmness from continuing to engage in that conduct. There are disputed issues of fact as to whether the adverse action was motivated at least in part by plaintiff's protected conduct so as to satisfy the third element of plaintiff's prima facie case. *See Wurzelbacher*, 675 F.3d at 583.

19

There are also genuine issues of material fact as to whether defendant Stephens would have terminated plaintiff in the absence of her protected conduct. Accordingly, defendant Stephens is not entitled to summary judgment on plaintiff's First Amendment retaliation claim under § 1983 as a matter of law.

## B.    Substantive due process claim against Stephens (Count VI)

Plaintiff moves for summary judgment on her substantive due process claim brought under § 1983 against defendant Stephens (Doc. 20, Count VI). (Doc. 141). Defendant Stephens opposes plaintiff's motion (Doc. 148) and has filed a cross-motion for summary judgment on the claim (Doc. 143). The issues presented by the parties' summary judgment motions are: (1) whether plaintiff's substantive due process claim is barred as duplicative of her First Amendment retaliation claim, and (2) if not, whether plaintiff has come forward with sufficient evidence to pursue a substantive due process claim against Stephens under an alternative theory of liability.

### 1.    Procedural background

Plaintiff brings a claim against defendant Stephens for violation of her substantive due process rights under the Fourteenth Amendment. (Doc. 20, Am. Complt., ¶¶ 110-124, Count VI). Plaintiff alleges that defendant Stephens deprived her of the fundamental rights of property and liberty without due process and arbitrarily abused his power as a government official by terminating plaintiff, a public figure, suddenly and without notice. (*Id.*, ¶ 110-114). Plaintiff alleges that terminating her in this manner created the impression that she had committed a serious violation of procedure, law, or ethics and devastated her reputation in the legal community. (*Id.*, ¶ 112). Plaintiff further alleges that Stephens "published and/or made knowingly false statements" to members of the legal community "that [she] was a poor worker" in that she procrastinated, destroyed work product, was dishonest, was abusive to co-workers,

and acted unprofessionally in the workplace. (*Id.*, ¶¶ 115-118). Plaintiff claims that the

statements related to her "reputation" and her "professionalism" and "constituted defamation per

se." (*Id.*, ¶ 118). Plaintiff alleges that Stephens's statements and continued actions over the

course of six or eight months prevented her from obtaining employment and from "continuing in

her career." (*Id.*, ¶¶ 116-117, 119). Plaintiff alleges that Stephens used his official power as a

sitting judge to discriminate against her and to damage her reputation in the legal community,

and he acted with malice, ill-will, and/or a spirit of revenge. (*Id.*, ¶¶ 120-121).

Judge Barrett issued an Order in this case denying defendant Stephens's motion to

dismiss the substantive due process claim against him. (Doc. 40; *see Edelstein v. Stephens*, No.

1:17cv305, 2018 WL 1558868, at *4 (S.D. Ohio Mar. 31, 2018). Judge Barrett addressed

plaintiff's substantive due process claims against each of the individual defendants. He

recognized that "substantive due process only protects a narrow class of interests, including those

enumerated in the Constitution, those so rooted in the traditions of the people as to be ranked

fundamental, and the interest in freedom from government actions that shock the conscience."

*Id.* (citations and internal quotations omitted). Judge Barrett summarized the governing law as

follows:

> The Sixth Circuit has explained that "a person's reputation, good name, honor, and
> integrity are among the liberty interests protected by the due process clause of the
> [F]ourteenth [A]mendment." *Parrino v. Price*, 869 F.3d 392, 398 (6th Cir. 2017)
> (quoting *Quinn v. Shirey*, 293 F.3d 315, 319 (6th Cir. 2002)). "To establish a
> deprivation of a protected liberty interest in the employment context, [the plaintiff]
> must "demonstrate stigmatizing governmental action which so negatively affects
> [her] . . . reputation that it effectively forecloses the opportunity to practice a chosen
> profession." *Id.* (quoting *Joelson v. United States*, 86 F.3d 1413, 1420 (6th Cir.
> 1996)). The plaintiff must also have alleged "that the stigmatizing information was
> publicly disclosed."

*Id.* Judge Barrett found that plaintiff had stated a claim for violation of her substantive due

process rights by Stephens because she alleged in the amended complaint that:

Stephens terminated Plaintiff's employment in a manner which "created the impression that Plaintiff had committed a serious violation of procedure, law or ethics and devastated Plaintiff's reputation in the legal community." (Doc. 20, ¶¶ 86-87). Plaintiff alleges further that Defendant Stephens "published and/or made statements to third parties that Plaintiff was a poor worker" and "made derogatory comments about Plaintiff to members of the legal community." (Doc. 20, ¶¶ 90, 91). Plaintiff claims that "[t]hese comments resulted in Plaintiff being unable to secure employment and effectively prevented Plaintiff from continuing in her career." (Doc. 20, ¶¶ 92). Therefore, the Court concludes that Plaintiff has adequately alleged a substantive due process claim based on the termination of her employment. (citation omitted).

*Id*. at *4.

Judge Barrett did not explicitly address whether plaintiff's allegations against defendant Stephens supported a claim under the "shocks the conscience" standard of the substantive Due Process Clause, but he addressed whether statements allegedly made by defendants Gmoser and Ferguson satisfied the standard. *Id*. at *5. Judge Barrett found the following statements do not rise to the "conscience-shocking level": (1) allegedly false statements made by Gmoser in bad faith which he knew to be false or made with reckless disregard for the truth, about plaintiff's work performance, which he published to a potential employer of plaintiff, that her "work was 'disjointed'; that he had trouble 'getting stuff back from her on foreclosures'; and he 'had a problem getting things'" (Doc. 20, ¶¶ 191, 197); and (2) Ferguson's response to a potential employer when asked his opinion about Edelstein that, "Oh she's horrible" (*Id*., ¶ 208). *Edelstein,* 2018 WL 1558868, at *5. Judge Barrett found that plaintiff had, however, stated a claim for violation of her substantive due process rights under Counts VI, VII, and VIII to the extent her claim "is based upon a deprivation of a protected liberty interest in the employment context." *Id*. at *6.

## 2. *Plaintiff's substantive due process claim based on the exercise of her First Amendment right*

Plaintiff alleges that Stephens violated her substantive due process rights when he

terminated plaintiff after she requested time off to observe the Jewish High Holy Days. (Doc. 141 at 4-5). Plaintiff alleges she has a liberty interest "in not being denied employment for exercising her First Amendment right." (*Id.* at 5; *see Adkins v. Bd of Educ. of Magoffin Cty*, 982 F.2d 952, 955 (6th Cir. 1993)). Plaintiff argues that she must establish two material facts to prevail on her claim that Stephens violated the substantive Due Process Clause by terminating her for exercising a First Amendment right: (1) a First Amendment right existed, and (2) she was terminated for exercising a First Amendment right. (Doc. 141 at 5). She alleges there is no dispute that the right to observe her "religious holidays free from the interference of the government or government officials" is a right guaranteed under the Free Exercise Clause of the First Amendment. (*Id.* at 5). Plaintiff further alleges there is no dispute that she was "denied employment for exercising a First Amendment right." (*Id.*). She alleges that the law does not require her to show more and to establish that Stephens acted with a discriminatory motive to establish her substantive due process claim. (*Id.* at 10). Plaintiff alleges that the reasons Stephens gave for her termination - problems between plaintiff and other members of Stephens's staff - were fabricated after the fact and show there is no dispute that the reason she was terminated is because she "attempted to exercise her right to observe her religion." (*Id.* at 9).

In response, Stephens argues that plaintiff is not entitled to summary judgment on her substantive due process claim against him because the claim is duplicative of plaintiff's claim for First Amendment retaliation. (Doc. 148 at 3-5). Stephens asserts that when a more specific constitutional provision applies, a cause of action cannot be based on a deprivation of substantive due process. (Doc. 148 at 4, citing *Albright v. Oliver*, 510 U.S. 266, 273 (1994) ("Where a particular Amendment 'provides an explicit textual source of constitutional protection' against a particular sort of government behavior, 'that Amendment, not the more generalized notion of

substantive due process, must be the guide for analyzing these claims.'") (quoting *Graham v. Connor*, 490 U.S. 386, 395 (1989)); *Brandenburg v. Hous. Auth. of Irvine*, 253 F.3d 891 (6th Cir. 2001) ("Any claim for a violation of Brandenburg's substantive due process right to free speech is duplicative of her First Amendment retaliation claim," so that the district court correctly held the defendant was entitled to judgment as a matter of law on the plaintiff's substantive due process claim.)).

Plaintiff alleges in reply that she has demonstrated "she was deprived of a particular constitutional guarantee." (Doc. 155 at 6). Plaintiff contends that "[t]he substantive due process claim in Count VI . . . arises from [the alleged] First Amendment violation, as Stephens created a false reason for the termination (pretext) that resulted in an unjustified label of infamy and a substantive due process violation." (*Id*. at 8). Plaintiff asserts that under the case law, she has a liberty interest in her reputation and career and in the right to "practice [her] profession without the burden of an unjustified label of infamy. . . ." (Doc. 155 at 9, quoting *Joelson*, 86 F.3d at 1420). Plaintiff alleges that Stephens has "placed a label of infamy on [her] that precluded [her] from practicing her profession and from having an active and successful career" by "putting forth a pretext for the termination, i.e. that she was abusive to co-workers, procrastinated to the detriment, not just of her employer, but of the entire Court," and that, because of her personality, she "could not 'get along' with the other members of his staff." (*Id*. at 9, 12). Plaintiff alleges she is not precluded from bringing a substantive due process claim for violation of her First Amendment rights because the two claims she brings are "not alternative claims, but distinct claims." (*Id*. at 9-12). Plaintiff concedes that both claims are based on the same event - "a discriminatory termination" - and that both claims address "the real reason for the termination and Stephens' fabricated reason for the termination." (*Id*. at 13). She asserts,

though, that the claims differ because her substantive due process claim also addresses "the stigmatizing aspects of the termination as a result of the sudden and unprofessional manner in which plaintiff was terminated." (*Id.*).

Stephens distinguishes the authority plaintiff cites for the proposition that a First Amendment right may constitute a liberty interest protected under the Due Process Clause. Defendant argues that first, while *Adkins* "seemingly recognizes a liberty interest in not being denied public employment for exercising one's First Amendment rights," the case involved only a First Amendment claim and not a due process claim. (Doc. 148 at 4-5, citing *Adkins*, 982 F.2d at 955). In addition, Stephens contends that the language from *Adkins* on which plaintiff relies comes from the decision in *Jackson v. City of Columbus*, 67 F. Supp. 2d 839, 858 (S.D. Ohio 1998), which cites *Adkins* but found a liberty interest in a First Amendment right in the context of procedural rather than substantive due process claims. *Id.* at 5 (citing *Jackson*, 67 F. Supp. 2d at 858). Defendant alleges that "all cases citing *Jackson* for this proposition have similarly applied it only in the context of procedural-due-process deprivations." (*Id.*, citing *Ellsworth v. City of Lansing*, 205 F.3d 1340 (table), 2000 WL 191836 (6th Cir. Feb. 10, 2000); *Karuna v. Kellogg*, No. 00-cv-694, 2001 U.S. Dist. LEXIS 23944, *49-50 (D. Or. Nov. 21, 2001); *Ritchie v. Coldwater Cmty. Sch.*, No. 1:11-cv-530, 2012 WL 2862037 (W.D. Mich. July 11, 2012)).

The law is well-settled that, "[w]here a particular Amendment 'provides an explicit textual source of constitutional protection' against a particular sort of government behavior, 'that Amendment, not the more generalized notion of substantive due process, must be the guide for analyzing these claims.'" *Albright*, 510 U.S. at 273 (quoting *Graham*, 490 U.S. at 395); *see also Brandenburg*, 253 F.3d at 900; *H.M. v. Bd. of Educ. of the Kings Loc. Sch. Dist.*, No. 1:14-cv-64, 2015 WL 4624629, at *3 (S.D. Ohio Aug. 3, 2015) (citing *County of Sacramento v. Lewis*, 523

U.S. 833, 840 (1998); *Estate of Dietrich v. Burrows,* 167 F.3d 1007, 1013 (6th Cir. 1999)). The Sixth Circuit has consistently adhered to this rule. *See Thaddeus-X,* 175 F.3d at 387 (citing *Albright,* 510 U.S. at 273) (*quoting* in turn *Graham,* 490 U.S. at 395). *See also Handy-Clay,* 695 F.3d at 547. The Sixth Circuit has explicitly held that "[a]ny claim for a violation of [a] substantive due process right to free speech is duplicative of [a] First Amendment retaliation claim." *Id.* at 547 (quoting *Brandenburg,* 253 F.3d at 900) (citation omitted)). Thus, a free speech retaliation claim must be pursued under the First Amendment and cannot be evaluated under substantive due process standards. *Id.* (citing *Thaddeus-X,* 175 F.3d at 387). *See also Williams v. Luttrell,* CIV.A. 06-2777, 2007 WL 3236662, at *8 (W.D. Tenn. Nov. 1, 2007) ("In this case, it appears that the Plaintiff's Fourteenth Amendment substantive due process claim is based on his allegation that the Defendant retaliated against him for exercising his First Amendment rights. As such, it is duplicative of his First Amendment claim and must therefore be dismissed.").

Plaintiff premises her substantive due process claim against Stephens on a liberty interest under the First Amendment. Under the well-settled law, plaintiff's claim for deprivation of her liberty interest as guaranteed by the First Amendment must be analyzed under that specific constitutional provision. Plaintiff cannot base her cause of action on the substantive Due Process Clause given that a more specific constitutional provision applies. Plaintiff's substantive due process claim is duplicative of her First Amendment claim insofar as she claims a deprivation of a liberty interest rooted in the First Amendment, and her substantive due process claim is therefore foreclosed by controlling precedent.

### 3. *Plaintiff's substantive due process claim based on a liberty interest in her reputation*

Plaintiff also alleges that Stephens violated her substantive due process rights when he

terminated plaintiff "in such a manner as to ruin her reputation and cause her to be stigmatized to the extent she was unemployable." (Doc. 141 at 4-5). Plaintiff claims that Stephens deprived her of a liberty interest in her reputation and career. (*Id.* at 10, citing *Joelson*, 86 F.3d at 1420). Plaintiff claims her termination was "stigmatizing" because she was "a public official" of Butler County who "dealt with the legal community through phone calls, emails and in-person appearances." (*Id.* at 11, citing Pltf. Aff., Doc. 141-5, ¶ 20). She alleges that "[t]erminations from court positions were 'unusual'" and do not occur "very often." (*Id.*, citing Judge Keith Spaeth Depo., Doc. 135 at 13; *see also* Tammy Maxwell Depo., Doc. 133 at 32, 41 (knew of two terminations in the 22 years she worked in the court); Yates Depo. I, Doc. 136 at 24 (knew of two terminations in 14 years)). Plaintiff contends that her termination was "the talk" around the courthouse for a few days. (Doc. 141 at 12, citing Spaeth Depo., Doc. 135 at 13, 15).[5] She alleges that attorneys expressed surprise that she had not been given notice or allowed to resign because "this type of termination is generally considered unprofessional among lawyers and reserved for instances when the employee has committed wrongdoing." (*Id.*, citing Doc. 141-5, Pltf. Aff., ¶ 23; Maxwell Depo., Doc. 133 at 38, 39). Plaintiff concludes there is no genuine issue that "this termination was not only cruel and humiliating to Plaintiff, it was a stigmatizing action taken by Stephens against Plaintiff." (*Id.* at 13). Plaintiff further alleges that Stephens made numerous statements following her termination that damaged her good name and her reputation.

---

[5] Plaintiff makes additional allegations which cannot be considered because they are hearsay. The inadmissible hearsay statements plaintiff offers include her allegation that attorneys told her "many times" that "they could not assist her with litigation or provide expert testimony because they could not become involved in litigation against a sitting judge [for the reason] there may be repercussions to their career, their practice, or their clients if they were associated with Plaintiff when they practiced before [the] Butler County Court." (Doc. 141 at 12-13, citing Pltf. Aff., Doc. 141-5, ¶¶ 24-25).

In his motion for summary judgment on this claim, Stephens acknowledges that "[i]njury to a person's reputation, good name, honor or integrity constitutes the deprivation of a liberty interest when the injury occurs in connection with the employee's termination." (Doc. 143 at 10, quoting *Isaac v. Conrad*, 39 F. Supp. 2d 1025, 1029 (S.D. Ohio 1999) (citing *Ludwig v. Bd. of Trustees of Ferris State Univ.*, 123 F.3d 404, 410 (6th Cir. 1997)). However, Stephens contends that plaintiff has not demonstrated the elements required to establish the deprivation of a protected liberty interest in the employment context: i.e., both a "stigmatizing Government action which so negatively affects [her] . . . reputation that it effectively forecloses the opportunity to practice a chosen profession," and that the "allegedly stigmatizing information was 'publicly disclosed.'" (*Id*. at 10-11, quoting *Parrino*, 869 F.3d at 398). Stephens argues that plaintiff's substantive due process claim falls short because she claims nothing more than a "sudden[]" termination "without notice" that allegedly created a "false stigma that she engaged in serious misconduct," which is insufficient to state a claim for violation of a constitutional right as a matter of law. (Doc. 143 at 10-11, citing Doc. 20, Am. Complt., ¶¶ 111-12)). Stephens contends that plaintiff was an at-will employee, and as such she must show something more than the stigma that ordinarily attaches and affects future employment opportunities whenever an employee is involuntarily terminated. *Id*. at 11 (citing *Bd. of Regents v. Roth*, 408 U.S. 564, 573-74 (1972); *Ratliff v. Milwaukee*, 795 F.2d 612, 625 (7th Cir. 1986)). Stephens alleges that plaintiff has shown only that her termination without prior notice "generated gossip" inside the court, and there is no evidence that the sudden nature of plaintiff's termination created the impression that plaintiff had committed an immoral or dishonest act. (Doc. 143 at 11; *see Ludwig*, 123 F.3d at 410 (citing *Roth*, 408 U.S. at 573)). To the contrary, Stephens contends that every witness deposed in this lawsuit who was working in the court when plaintiff was

28

terminated testified they did not know the reason she was fired, or they understood the reason was her inability to get along with Stephens's staff. (*Id.* at 11, citing Maxwell Depo., Doc. 133 at 35-36; Judge Noah Powers Depo., Doc. 134 at 19; Yates Depo. I, Doc. 136 at 21-22; Yates Depo. II, Doc. 138 at 75-76; Spaeth Depo., Doc. 135 at 36). Further, Stephens argues that nothing about the events surrounding plaintiff's termination suggested that she had committed an immoral or dishonest act because he fired her privately in her office with only Barger as a witness and advised another magistrate of the need to cover her docket. (*Id.* at 12, citing Maxwell Depo., Doc. 133 at 31; Powers Depo., Doc. 134 at 50).

In her reply to her motion for summary judgment, plaintiff alleges that the following two facts, in addition to those raised in her motion for partial summary judgment, show that Stephens's actions surrounding the termination are sufficient to warrant summary judgment in her favor on the substantive due process claim against him. (Doc. 149 at 27). First, court personnel Powers, Yates, and Maxwell testified it was "unusual for a person to be terminated at the Court" and the only terminations they remembered were of employees who had committed some wrongdoing. (*Id.*, citing Maxwell Depo., Doc. 133 at 14; Powers Depo., Doc. 134 at 16; Yates Depo. II, Doc. 138 at 24). Second, she alleges that Judge Spaeth admitted plaintiff's termination was the "talk of the day" for a few days (Spaeth Depo., Doc. 135 at 13, 15), and Maxwell testified that people speculated as to why plaintiff was terminated and expressed shock about it (Maxwell Depo., Doc. 133 at 14).

Judge Barrett determined in his prior Order on defendants' motion to dismiss that plaintiff adequately stated a substantive due process claim based on her termination by alleging that Stephens terminated plaintiff's employment in a manner which "created the impression that Plaintiff had committed a serious violation of procedure, law or ethics and devastated Plaintiff's

reputation in the legal community (Doc. 20, ¶¶ 86-87)"; "Stephens 'published and/or made statements to third parties that Plaintiff was a poor worker' and 'made derogatory comments about Plaintiff to members of the legal community' (Doc. 20, ¶¶ 90, 91)"; and "'[t]hese comments resulted in Plaintiff being unable to secure employment and effectively prevented Plaintiff from continuing in her career' (Doc. 20, ¶ 92)." *See Edelstein,* 2018 WL 1558868, at * 4. Now that the case has progressed to the summary judgment stage, the issue to be resolved is whether plaintiff has produced evidence to support her allegations and create a genuine issue of material fact on the elements of this claim under the applicable standard.

The Sixth Circuit applies a five-part test to determine whether an at-will employee's liberty interest in her reputation is implicated by government action in connection with the employee's termination. *Isaac,* 39 F. Supp. 2d at 1028 (citing *Ferencz v. Hairston,* 119 F.3d 1244, 1250 (6th Cir. 1997) (quoting *Burkhart v. Randles,* 764 F.2d 1196, 1201 (6th Cir. 1985) (citations omitted)); *Ludwig,* 123 F.3d 404). Stigmatizing statements made by an employer implicate a liberty interest in one's reputation if the following five factors are satisfied:

> First, the allegedly stigmatizing statements must be offered in conjunction with the employee's termination. Second, the statements must rise to a level of a moral stigma. Third, the statements must have been made public by the employer. Fourth, the plaintiff must claim the employer's statements were false. Finally, the fifth element requires that the employer have voluntarily disseminated the statements to the public.

*Id.* (citing *Ludwig,* 123 F.3d at 410).

Plaintiff has not produced evidence to create a genuine issue of material fact as to whether Stephens terminated her in a manner, and made stigmatizing statements about her, which satisfy the five-part *Ludwig* test and effectively resulted in plaintiff being unable to secure employment. *See Edelstein,* 2018 WL 1558868, at *4. It is undisputed that Stephens terminated plaintiff in the privacy of his office, with only Barger present as a witness. Plaintiff asserts that

the sudden termination generated discussion and speculation, but there is no evidence that Stephens made stigmatizing statements to the public at the time of her termination and in connection with her termination.

Nor has plaintiff produced evidence to show that Stephens made many of the stigmatizing statements which she attributes to him post-termination. Plaintiff alleges that Stephens told attorneys she "destroyed work product," but her allegation is based on conjecture. Plaintiff testified at her deposition that she did not know whether Stephens made this statement, and Stephens denies that he did. (Pltf. Depo. I, Doc. 131 at 182). Plaintiff also alleges that Stephens told other attorneys that she procrastinated, was dishonest, was abusive to co-workers, and acted unprofessionally at the workplace, but Stephens denies that he did so and plaintiff has provided no evidence to support her allegations to the contrary. (*See* Stephens OC ROGs, Doc. 126-10, Nos. 7, 8; Stephens IC ROGs, Doc. 126-9, Nos. 3, 17, 23; Stephens OC RFAs, Doc. 126-8, Nos. 36, 37; Stephens IC RFAs, Doc. 126-7, No. 25). Because plaintiff has produced no evidence to support a finding that Stephens made such statements, the alleged stigmatizing statements cannot be considered on summary judgment.

Plaintiff also alleges that Stephens made statements when putting forth a "pretext for termination" in the EEOC proceedings, in response to a letter exchanged between then-counsel for the parties, and in this litigation. Plaintiff alleges that Stephens "cast [her in] a negative light" by alleging as "a pretext for her termination" that "she was abusive to co-workers," she "procrastinated to the detriment, not just of her employer, but of the entire Court," and "because of Plaintiff's personality, Plaintiff could not 'get along' with the other members of his staff." (Doc. 155 at 9). These statements do not satisfy the first element of the five-part *Ludwig* test because they do not relate to the stigmatizing impact of the actual termination. Instead, plaintiff

alleges that Stephens made the comments in response to the post-termination discrimination claims and proceedings that she instituted.

In addition, the comments plaintiff attributes to Stephens do not satisfy the second element of the five-part test because they do not rise to the level of a "moral stigma." "[T]o implicate the Due Process Clause, the employer must have made a statement in the course of the employee's discharge 'that might seriously damage [her] standing and associations in [her] community' or that might impose 'on [her] a stigma or other disability that [would] foreclose[] [her] freedom to take advantage of other employment opportunities.'" *Ludwig,* 123 F.3d at 410 (quoting *Roth,* 408 U.S. at 573). Plaintiff must show a "moral stigma such as immorality or dishonesty" to establish a deprivation of a liberty interest. *Id.* (citing *Roth,* 408 U.S. at 573). An employer's allegations of "merely improper or inadequate performance, incompetence, neglect of duty or malfeasance" do not deprive a plaintiff of her liberty interest. *Id.* (citing *Siegert v. Gilley,* 500 U.S. 226 (1991); *Chilingirian v. Boris,* 882 F.2d 200, 205-06 (6th Cir. 1989); *Lake Mich. Coll. Fed'n of Teachers v. Lake Mich. Cmty. Coll.,* 518 F.2d 1091, 1096-97 (6th Cir. 1975)). The comments that Stephens allegedly made about plaintiff's personality traits and her professional competency do not suggest that plaintiff was terminated because she is an immoral or dishonest person, and therefore the comments cannot be construed as imposing a "moral stigma" on plaintiff as a matter of law.

Finally, plaintiff has not produced evidence to satisfy the fifth element of the five-part test. There is no evidence that Stephens voluntarily disseminated to the public the disparaging statements plaintiff attributes to him. Plaintiff alleges, and Stephens does not dispute, that he told one attorney plaintiff was terminated because she had a personality clash with the other members of his staff, which is not a stigmatizing statement. (Stephens OC ROGS, Doc. 126-10,

No. 8). Plaintiff has not produced additional evidence to show that Stephens made any allegedly disparaging statements about her to the public. The only "stigmatizing" statements plaintiff has produced are taken from documents that were generated in connection with plaintiff's settlement demand and her discrimination claims, including a letter Stephens's counsel sent to plaintiff's then-counsel, which plaintiff filed in this case in support of her first motion to disqualify counsel (Doc. 60)[6]; Stephens's affidavit submitted to the EEOC in response to a charge filed by plaintiff (Doc. 126-10); and discovery produced in the course of this litigation.

Accordingly, the evidence submitted by plaintiff, construed in her favor, does not support a finding that Stephens voluntarily disseminated to the public, in conjunction with plaintiff's termination, stigmatizing statements which "rise to the level of a 'moral stigma.'" *See Ludwig*, 123 F.3d at 410. Defendant Stephens is entitled to summary judgment in his favor on plaintiff's substantive due process claim to the extent it is premised on a liberty interest in her reputation that was allegedly implicated by her termination.

### 4. *"Conscience-shocking" conduct*

The Order on defendants' motion to dismiss does not explicitly address whether plaintiff's allegations against defendant Stephens support a claim under the "shocks the conscience" standard of the substantive Due Process Clause. (Doc. 40). Plaintiff did not present this argument in her motion for summary judgment against Stephens. (Doc. 141). Plaintiff alleges in her reply in support of the motion that she is "renew[ing]" her claim "that the behavior engaged in by Stephens, including making false statements to this Court even though he is a judge, constitutes actions that shock the conscience." (Doc. 155 at 6). Plaintiff alleges that Stephens, a public official, took deliberate actions against her which were intended to injure her,

---

[6] Plaintiff filed a motion to seal the document (Doc. 59), which the undersigned denied (Doc. 79). Plaintiff's objection to the Order is pending before the district judge. (Doc. 89).

and she claims she has detailed numerous facts which show "the termination was sudden, very public, and unprofessional." (*Id.*). She contends that the allegations against Stephens in her motion for summary judgment (Doc. 141) satisfy the "shocks the conscience" standard as explained by Judge Barrett in his prior Order:

> The Sixth Circuit has recognized that it is difficult to determine where [conscience] shocking behavior resides on the continuum of conduct: The bookends present the easier cases. Merely negligent tortious conduct is categorically beneath constitutional due process, but conduct on the other extreme end of the culpability spectrum, that which is "intended to injure" without any justifiable government interest, most clearly rises to the "conscience-shocking" level. [*Cty. of Sacramento v. Lewis*, 523 U.S. 833, 848-49 (1998)].

(Doc. 40 at 9).

Plaintiff appears to rely on several allegations and facts in her motion for summary judgment to support this aspect of her substantive due process claim. Plaintiff asserts she was a "public official" of Butler County, Ohio, who communicated with the public and legal community (Pltf. Aff., Doc. 141-5, ¶ 20); she "was terminated suddenly and without notice" (Doc. 141 at 11, citing Spaeth Depo., Doc. 135 at 13, 15); her sudden disappearance from her position was noticed by many people; her termination was a "very rare event" as terminations from court positions were infrequent and unusual (Doc. 155 at 14, citing Spaeth Depo., Doc. 135 at 13, 15); court employee Tammy Maxwell stated that she was "absolutely shocked" when she learned plaintiff had been terminated as the termination was sudden and unexpected (Maxwell Depo., Doc. 133 at 32, 41); and Judge Spaeth testified at his deposition that plaintiff and her termination were "the talk of the day" and "probably [remained] the talk for a few days" (Spaeth Depo., Doc. 135 at 13, 15). Plaintiff alleges that there is no genuine issue that "this termination was not only cruel and humiliating to Plaintiff, it was a stigmatizing action taken by Stephens against Plaintiff." (Doc. 141 at 13).

The evidence plaintiff has produced does not, as a matter of law, support a finding that Stephens's conduct in terminating plaintiff was "conscience-shocking." Plaintiff seeks to rely on a number of allegations which are inadmissible hearsay and therefore cannot be considered on summary judgment. *See Alexander*, 576 F.3d at 558. These include her allegations that "Tammy Maxwell attested that when a termination at the court occurred, people question why the termination happens and make comments such as 'oh, my goodness, and things like that'" (Doc. 141 at 12, citing Maxwell Depo., Doc. 135 at 14); "plaintiff spoke to many attorneys in the legal community in her search for job leads the few weeks after [she] was terminated and the majority expressed disbelief about the termination" (*Id.*, citing Pltf. Aff., Doc. 141-5, ¶ 21); "[t]he sudden termination caused speculation among court staff and members of the legal community as Plaintiff was asked as she was packing up her office and by several attorneys she spoke to later that day, what she had done to be terminated so suddenly" (*Id.*, citing Pltf. Aff., Doc. 141-5, ¶ 22); "Attorneys, in particular, expressed surprised at the fact that Plaintiff had not been given notice or [been] allowed to resign, as this type of termination is generally considered unprofessional among lawyers and reserved for instances when the employee has committed wrongdoing" (*Id.*, citing Pltf. Aff., Doc. 141-5, ¶ 23; Maxwell Depo., Doc. 133 at 38-39); and "Plaintiff was told many times by attorneys that they could not assist her with her litigation or provide expert testimony because they could not become involved in litigation against a sitting judge," the rationale being "that there may be repercussions to their career, their practice, or their clients if they were associated with Plaintiff when they practiced before [the] Butler County Court." (*Id.* at 12-13, citing Pltf. Aff., Doc. 141-5, ¶¶ 24-25). The relevant, admissible evidence demonstrates that Stephens terminated plaintiff in the privacy of his office, with one other witness present. Although the termination may have been an extremely rare occurrence in the

court which surprised people when they learned about it, this is not evidence that the termination itself was "conscience-shocking" and rose to the level of a constitutional violation.

Further, allegedly disparaging statements Stephens made post-termination do not, as a matter of law, satisfy the "shocks the conscience" standard of the substantive Due Process Clause. The statements at issue are similar to statements allegedly made by Gmoser and Ferguson, which Judge Barrett addressed in his prior Order and found fell short of the "shocks the conscience" standard. *Edelstein,* 2018 WL 1558868, at *5. Judge Barrett explicitly rejected plaintiff's claim that the following statements by these two defendants rose to the "conscience-shocking level": (1) allegedly false statements Gmoser made in bad faith which he knew were false or that he made with reckless disregard for the truth, about plaintiff's work performance, which he published to a potential employer of plaintiff, that her "work was 'disjointed', that he had trouble 'getting stuff back from her on foreclosures', and he 'had a problem getting things'" (Doc. 20, ¶¶ 191, 197); and (2) Ferguson's comment, "Oh, she's horrible," which he allegedly made to a potential employer when asked his opinion about Edelstein. *Edelstein,* 2018 WL 1558868, at *5[7]. Similar statements that Judge Stephens made post-termination about plaintiff's job performance and her ability to get along with others on his staff, the majority of which were made to defend against plaintiff's legal claims, likewise do not rise to the level of "conscience-shocking" as a matter of law. Plaintiff has not produced evidence to show that defendant Stephens made any other statements of a more egregious nature. There is no genuine issue that Stephens did not engage in conduct that "shocks the conscience."

---

[7] The Court found that plaintiff had, however, stated a claim for violation of her substantive due process rights to the extent her claim "is based upon a deprivation of a protected liberty interest in the employment context." *Id.,* at *6. This claim is addressed *infra.*

### 5. *Conclusion*

Insofar as plaintiff brings a substantive due process claim based on the alleged termination of her employment in violation of her First Amendment right to freely exercise her religion, she is precluded from pursuing this duplicative claim under the Fourteenth Amendment. Further, plaintiff has not produced evidence which, when construed in her favor, shows that defendant Stephens's conduct in connection with her termination rose to the level of "a moral stigma" under the *Ludwig* test or to the level of "conscience shocking." A reasonable juror could not find in plaintiff's favor on this claim. Summary judgment should be granted in Stephens's favor as a matter of law on plaintiff's substantive due process claim (Count VI).

## C. Substantive due process claims against Gmoser and Ferguson (Counts VII, VIII)

Plaintiff brings a substantive due process claim against Gmoser based on an incident that occurred on or about May 9, 2017. (Doc. 20, Am. Complt., Count VII). Plaintiff alleges that defendant Gmoser, while acting in his official capacity, contacted her then-employer, the Wood County Prosecutor's Office, and complained about the lawsuit she had instituted against him on May 5, 2017. (Doc. 20, ¶ 131). Plaintiff alleges that she believes Gmoser attempted to persuade her employer, Paul Dobson, to support Gmoser in the lawsuit and/or terminate plaintiff's employment. (*Id.*, ¶ 132). Plaintiff alleges that Dobson was angry with her because she had sued his "friend," Gmoser, and Dobson attempted to persuade plaintiff to dismiss the lawsuit against Gmoser. (*Id.*, ¶ 133). Plaintiff asserts she refused, and her employment with Wood County was terminated shortly thereafter. (*Id.*, ¶¶ 133, 134). Plaintiff alleges that Gmoser made statements in his official capacity that were knowingly false, malicious, made with ill-will and/or in the spirit of revenge or were made negligently, with reckless disregard for the truth, and without personal knowledge, and were an arbitrary and unreasonable abuse of power by a

government official. (*Id.*, ¶¶ 135, 136, 137, 139). Plaintiff alleges that as a result of Gmoser's actions, she lost her employer's trust and her employment at the Wood County Prosecutor's Office, and her reputation was further harmed. (*Id.*, ¶ 138). Plaintiff brings a substantive due process claim against Ferguson based on allegations that he made derogatory statements to one or more members of the legal community that were arbitrary and an unreasonable abuse of power by a government official. (*Id.*, ¶¶ 143-161; Count VIII).

Defendants Gmoser and Ferguson move for summary judgment on plaintiff's substantive due process claims against them. (Doc. 143 at 13-19). Defendants argue that plaintiff's claims fail because they did not make "a [stigmatizing] statement in the course of the employee's discharge" as required in order to deprive an employee of a protected liberty interest. (*Id.* at 8, citing *Isaac*, 39 F. Supp. 2d at 1029 (citing *Ludwig*, 123 F.3d at 410). First, defendants assert there is no evidence that Ferguson made any statement about plaintiff to her new employer, Dobson, or to another prospective employer. (Doc. 143 at 13, citing Pltf. Depo. II, Doc. 132 at 26-27). Second, they allege that the substantive due process claim against Gmoser is premised on Gmoser's alleged communications with Dobson, which were not made in connection with plaintiff's termination. (*Id.*, citing Ferguson OC ROGs, Doc. 126-3, No. 2).

In order to prevail on plaintiff's substantive due process claims against Ferguson and Gmoser for deprivation of a protected liberty interest in her employment, plaintiff must show that defendants engaged in conduct

> that might seriously damage [her] standing and associations in h[er] community or that might impose "on [her] a stigma or other disability that [would] foreclose[] [her] freedom to take advantage of other employment opportunities." A moral stigma such as immorality or dishonesty is required to show a deprivation of liberty.

*Ludwig*, 123 F.3d at 410 (quoting *Roth*, 408 U.S. at 573). *See also Joelson*, 86 F.3d at 1420 (holding in the context of a procedural due process claim that "to establish a deprivation of a

protected liberty interest in the employment context, a plaintiff must demonstrate stigmatizing governmental action which so negatively affects his or her reputation that it effectively forecloses the opportunity to practice a chosen profession"). The stigmatizing comments must be made in the course of the employee's termination. *Isaac*, 39 F. Supp. 2d at 1029 (citing *Ludwig*, 123 F.3d at 410).

The evidence plaintiff has produced does not permit a reasonable inference that either Ferguson or Gmoser engaged in conduct that deprived plaintiff of a liberty interest in her employment. Plaintiff alleges that Ferguson violated her substantive due process rights when, while acting in his official capacity as a public prosecutor, he "interfered in Plaintiff's career by recklessly or maliciously making negative comments about Plaintiff and her abilities and/or performance as an attorney that was not based on facts and had the purpose and effect of harming her reputation and precluding her from an employment opportunity." (Doc. 140 at 11). Plaintiff relies solely on a negative reference Ferguson allegedly gave that included the direct quote, "Oh, she's horrible." (*Id.*). Plaintiff alleges that Ferguson had no personal knowledge of any behavior on her part that would cause her to be labeled "horrible." (*Id.*). She claims there is no genuine issue "regarding the material fact that Ferguson made a stigmatizing comment about Plaintiff, that was made public, related to her reputation and ability to perform work as a lawyer, and was made even though Ferguson had no personal knowledge to support the comment." (*Id.* at 11-12). Plaintiff also alleges there is no material fact the comment was "unjustified" because it was not supported. (*Id.* at 12, citing *Joelson*, 86 F.3d at 1420). Finally, plaintiff alleges there is no genuine issue the comment was based on false information. (*Id.* at 14-18).

Plaintiff premises her substantive due process claim against Ferguson on a phrase excerpted from a single statement he made in response to an inquiry by Dobson before Dobson hired plaintiff:

> [Edelstein] was horrible to work with because we had trouble getting things back from her, but I don't know if that issue was because of Edelstein or because of the Judge she previously worked for.

(Doc. 143 at 13, citing Ferguson OC ROGs, Doc. 126-3, Nos. 2, 3, 4, 6; Ferguson RFAs, Doc. 126-1, No. 18; Gmoser OC ROGs, Doc. 126-6, No. 3, Gmoser IC ROGs, Doc. 126-5, Nos. 9, 11; Gmoser RFAs, Doc. 126-4, No. 21; Dobson Aff., Doc. 131-1, ¶ 8). Ferguson explained that he made the comment, "Oh, she's horrible," in response to a call from Gmoser asking for input on plaintiff's work, which Ferguson immediately followed with "an explanation that the specific problem seemed to be delays in processing motions and judgments"; he did not "know whether the problem was with Kim or with the judge"; and his "information was second hand." (Ferguson OC ROGs, Doc. 126-3, No. 2; Ferguson RFAs, Doc. 126-1, No. 18). Ferguson explained that he did not comment about plaintiff to Dobson, and Gmoser confirmed that he was the one who called Ferguson to get his input after Dobson had called Gmoser seeking information about plaintiff's employment with Butler County. (Ferguson OC ROGs, Doc. 126-3, No. 5; Gmoser OC ROGs, Doc. 126-6, No. 3). Gmoser confirmed that to the best of his recollection, Ferguson told him that plaintiff's "work was horrible but that may be the result of delays caused by the illness of Judge Oney. Otherwise, she is a nice person." (Gmoser OC ROGs, Doc. 126-6, No. 3; Gmoser IC ROGs, Doc. 126-5, Nos. 9, 11; Gmoser RFAs, Doc. 126-4, No. 21). Dobson confirmed in his affidavit that Gmoser relayed Ferguson's statement to him after Dobson had contacted Gmoser, and that both Gmoser and Ferguson agreed that Ferguson's impression that plaintiff "appeared to be disorganized and slow in issuing decisions in her role as

Magistrate/Staff Attorney, especially in foreclosure cases . . . may not be a true reflection of [her] personal work habits, but instead a byproduct of the fact that she was working for an ill judge from whom obtaining review and approvals might be difficult." (Dobson Aff., Doc. 131-1, ¶ 8).

Plaintiff challenges whether Ferguson qualified his statement that she was "horrible" by explaining the issues with her work may not have been her fault. However, she has not produced any competent evidence that would permit a contrary finding. Plaintiff testified at her deposition that she was "told" that Ferguson "indicated that I was a horrible person." (Pltf. Depo. II, Doc. 132 at 191-92). On further questioning, she clarified that no one actually told her this, but instead "it was in the handwritten notes" of Dobson. (*Id*. at 191; *see* Pltf. Depo. II, Doc. 132 at 35-39). Plaintiff testified that Dobson's notes had accidentally been included in a folder of paperwork she was given to complete during the hiring process, and she intentionally copied the notes. (Doc. 132 at 36-38). Plaintiff testified that she was not present during Dobson's telephone conversation, but she "got the impression" from the handwritten notes and from a later conversation she had with Dobson that contrary to the subsequent statements Dobson made in his EEOC affidavit, Dobson spoke on the phone with both Gmoser *and* Ferguson before he hired plaintiff. (Pltf. Depo. I, Doc. 131 at 192-94; *see* Doc. 131-1 at 10; Pltf. Depo. II, Doc. 132 at 29). Plaintiff's deposition testimony about what Dobson, who is not a party to this lawsuit, purportedly told her and Dobson's handwritten notes of a conversation he had with another party are inadmissible hearsay that cannot be considered on summary judgment. Plaintiff has not produced any other evidence as to the substance of Ferguson's comment to Dobson.

Thus, there is no genuine dispute that when he was asked for his opinion, Ferguson made the comment that plaintiff or her work was "horrible," which he immediately qualified by explaining the fault could lie elsewhere and specifically might be Judge Oney's health issues.

This comment does not implicate a liberty interest as a matter of law because first, Ferguson's comment was not made in connection with plaintiff's termination. Plaintiff alleges that Ferguson made the comment several months after her discharge from Butler County and in connection with her application for a job with Wood County, which plaintiff successfully secured after the information Ferguson provided was relayed to Dobson.

Further, while plaintiff contends that *Joelson* applies here, the Sixth Circuit explained in its decision that comments such as those made by Ferguson do not implicate a liberty interest:

> Liberty interests "are not implicated . . . by allegations of improper or inadequate performance or, in some cases, by charges of incompetence, neglect of duty or malfeasance. A charge that merely makes a plaintiff less attractive to other employers but leaves open a definite range of opportunity does not constitute a liberty deprivation."

*Joelson*, 86 F.3d at 1420-21 (quoting *Gregory v. Hunt*, 24 F.3d 781, 788 (6th Cir. 1994) (citing in turn *Chilingirian*, 882 F.2d at 205-06 n.8). Ferguson at most characterized plaintiff's job performance as inadequate, which cannot reasonably be construed as a morally stigmatizing statement that deprived plaintiff of a liberty interest.

In addition, plaintiff has not produced evidence to support her contention that the comment was "unjustified" or "false." Plaintiff disputes that she was "horrible to work with" and that there was "trouble getting things back from her." (Doc. 140 at 14-18). However, plaintiff concedes there were delays, denying only that she was responsible for them. (*Id.*). Plaintiff alleges that "[a]ny lengthy timelines were not the result of Plaintiff's work, but how Judge Oney wanted to manage the foreclosures." (Doc. 140 at 17). Plaintiff also attributes delays to other factors which include Judge Oney's health issues and multiple surgeries over the years, which resulted in "slightly slower management of all files" during the last two years the judge was on the bench; Judge Oney and staff's failure to perform any work on foreclosure files

when plaintiff was on maternity leave in March 2012; and the burst housing bubble and a moratorium on foreclosures imposed by the banks, which caused a backlog on foreclosure judgment entries. (*Id*. at 14-18; Pltf. Aff., Doc. 140-1, ¶¶ 27-49). Rather than disproving Ferguson's comment, plaintiff confirms Ferguson's assertion that there were delays and that Judge Oney's management of her foreclosure docket and health issues were factors that led to delays, which Ferguson acknowledged could be the case. Ferguson's truthful comment is not somehow transformed into a substantive due process violation that effectively precluded plaintiff from pursuing her chosen career by addition of the words, "Oh, she's horrible," or "horrible to work with," or "Oh, not her. She's horrible." (*See* Dobson Aff., Doc. 131-1, ¶ 8).

Moreover, plaintiff does not claim, and has not produced evidence to show, that Ferguson provided this information to Dobson or to any other prospective employer. Plaintiff only vaguely contends that Ferguson "relay[ed] the issue of alleged delays in response to an employment reference" and that the comment by Ferguson was "made public." (Doc. 140 at 12; Doc. 149 at 29). Dobson and Ferguson have each confirmed that Ferguson made the comment to Gmoser, who then relayed it to Dobson. (Doc. 131-1 at 12-13, Dobson Aff., ¶ 8; Ferguson RFAs, Doc. 126-1, Nos. 17, 18). Plaintiff has not pointed to competent evidence in the record that calls Dobson's affidavit testimony or Ferguson's admissions into question.

Finally, there is no evidence that Ferguson's comment "effectively foreclose[d] plaintiff from gainful employment in her chosen field," an essential element of a substantive due process claim premised on the deprivation of a liberty interest in one's employment. *See Ludwig*, 123 F.3d at 410. Plaintiff concedes that Dobson hired her after talking with Gmoser and the individuals whose names she had given to Dobson as references. (Plaintiff Depo. II., Doc. 132 at 50-51).

Plaintiff has not alleged that Ferguson made a false, negative, or derogatory comment to any other member of the bar or prospective employer. Accordingly, Ferguson is entitled to summary judgment on plaintiff's substantive due process claim.

Plaintiff bases her substantive due process claim against Gmoser on (1) statements Gmoser allegedly made in response to Dobson's phone call to him seeking an employment reference, and (2) questions Gmoser posed in a phone call he placed to Dobson about the reasons plaintiff had sued Gmoser. (Doc. 140 at 18-22). Defendant argues that the substantive due process claim fails insofar as it is premised on statements made in connection with the employment reference because Gmoser did not deprive plaintiff of a liberty interest by making the call. Defendants argue in connection with the other phone call that there is no evidence that Gmoser intended the result of his phone call to Dobson to be plaintiff's termination, and plaintiff testified that she did not know what Gmoser's motivation was. (Doc. 143 at 12-13; *Id*. at 19, citing Pltf. Depo. II, Doc. 132 at 90). Defendants contend that Dobson has confirmed that his conversation with Gmoser was not the proximate cause of plaintiff's termination, and instead her "persistent untruthfulness and her inability to get along with co-workers . . . prompted Dobson to fire her." (*Id*. at 17, citing Dobson Aff., Doc. 131-1, ¶ 22).

In response, plaintiff disputes assertions by Dobson in his affidavit that Gmoser's phone call was not the reason for plaintiff's termination. (Doc. 149 at 28; *see* Dobson Aff., Doc. 131-1). Plaintiff argues that based on the sequence of events, there is no genuine issue regarding the material fact that Gmoser's abuse of his official position contributed to her job loss at Wood County, her current employability, and her status as "damaged goods" as opined by the vocational expert whose opinion she has proffered, Howard Caston. (*Id*. at 28, citing Doc. 140-9 at 9-10). Plaintiff argues that summary judgment is therefore warranted for her, not defendants.

In reply, defendants argue that plaintiff has offered no evidence to support her claim that Gmoser caused her termination from Wood County, and she has not raised a genuine issue of material fact that a jury must resolve. (Doc. 152 at 19). Defendants contend that plaintiff has not provided competent evidence that refutes Dobson's affidavit. (*Id.*). Rather, they allege that plaintiff has produced only inadmissible hearsay evidence in the form of (1) her affidavit setting forth representations that Dobson allegedly made to her, and (2) an expert's opinion that she is "damaged goods." (*Id.*, citing Doc. 149 at 28, 30-31; Pltf. Aff., Doc. 140-1, ¶¶ 10-12, 15-18, 22-24).

Plaintiff has not stated a claim against Gmoser for violation of her substantive due process rights "based upon a deprivation of a protected liberty interest in the employment context." *See Edelstein*, 2018 WL 1558868, at *4. Insofar as plaintiff alleges that Gmoser made disparaging statements about her work performance prior to the date she was hired by Wood County, the five-part *Ludwig* test is not satisfied. The comments did not deprive plaintiff of a liberty interest in her employment because they were not offered in conjunction with plaintiff's discharge. To the contrary, she was hired by Wood County despite Gmoser's comments. Further, the statements were not "morally stigmatizing." The statements related to nothing more than plaintiff's work competency or workplace behavior.

Gmoser's subsequent phone call to Dobson about her lawsuit likewise did not violate plaintiff's substantive due process rights. The statements were not made in the context of plaintiff's discharge from either her Butler County position or the Wood County job. Plaintiff has offered no evidence that the statements were false or morally stigmatizing in any sense. Plaintiff offers only speculation and conjecture about a possible connection between the phone

45

call and her termination, which is insufficient to create a genuine issue of material fact. Plaintiff's substantive due process claim against Gmoser should be dismissed.

## D. Intentional interference with a business relationship claim against Gmoser (Count XIX)

Plaintiff moves for summary judgment on her intentional interference with a business relationship claim against Gmoser. (Doc. 140). Plaintiff alleges that an employment relationship existed between Wood County, Ohio and her; Gmoser had knowledge of the relationship; he intentionally interfered with that relationship; and plaintiff was terminated from her employment with Wood County as a proximate result of that interference. (*Id*. at 2-8). Plaintiff alleges that Gmoser intentionally interfered in her employment relationship with Dobson when Gmoser "deliberately called Dobson or on about May 8, 2017, regarding the lawsuit Plaintiff filed" in federal court. (*Id*. at 5). Plaintiff alleges that Dobson asked her to come to his office to discuss the case; Dobson was clearly upset; Dobson told her that Gmoser was upset and had yelled at Dobson "wanting to know how Plaintiff knew about their conversation about her"; and "the intent to interfere in the employment relationship is demonstrated by Gmoser contacting Dobson about the litigation." (*Id*. at 5-6.).

Defendant Gmoser in turn moves for summary judgment in his favor on this claim on the ground plaintiff cannot establish that Gmoser intended to interfere with her employment and that his call to Dobson caused plaintiff's termination. (Doc. 143 at 17). Gmoser alleges that plaintiff's claim is based on assumptions she has made about the telephone conversation between Gmoser and Dobson about which she has no first-hand knowledge; the conversation occurred *after* Dobson had hired plaintiff as an Assistant Prosecutor for Wood County; and the conversation concerned allegations made by plaintiff that were based on opinions Gmoser had previously shared with Dobson. (*Id*., citing Doc. 20, Am. Complt., ¶¶ 331-334). Gmoser argues

that according to Dobson, he terminated plaintiff due to: (1) a pattern of untruthfulness (Dobson Aff., Doc. 131, ¶¶ 15-18); (2) unfounded accusations plaintiff had made about Dobson and her co-workers (*Id*. at ¶ 13, 22); and (3) plaintiff's confrontational and disruptive manner with both colleagues and opposing counsel (*Id*. at ¶ 20-21). In addition, Dobson was disturbed by the fact that plaintiff had misrepresented on her application to Wood County and in her interview with Dobson that her most recent employer had been Judge Oney, and that she left her previous position because Judge Oney retired; however, she later admitted to Dobson that this was false and that she had most recently been fired by Stephens. (*Id*. at ¶¶ 5-6, 15). Dobson was also disturbed by the fact that plaintiff had informed him that she had sued Stephens and Butler County, but she did not tell him that she had included Gmoser in the suit. (*Id*. at ¶¶ 15, 17).

Plaintiff alleges there is no dispute that Gmoser's "phone call about the lawsuit is the only reason" Dobson terminated her employment. (Doc. 149 at 31). Plaintiff alleges that each incident Dobson relied on as a reason for her termination from Wood County occurred before she notified Dobson of the lawsuit, "except the co-worker's outburst."[8] (Doc. 149 at 31). Plaintiff challenges Dobson's affidavit testimony as not credible and "takes exception with Defendants' mischaracterization to the court that Plaintiff was terminated for a 'pattern of untruthfulness.'" (*Id.*, n.179).

In reply, defendants argue that plaintiff has offered no evidence to support her claim that Gmoser caused her termination from Wood County. (Doc. 152 at 19). Defendants note that while plaintiff challenges the credibility of Dobson's affidavit testimony regarding the content of his call with Gmoser, she has not provided competent evidence that refutes Dobson's affidavit. (*Id.*). Rather, defendants assert that to rebut Dobson's affidavit testimony, plaintiff has produced

---

[8] It is not clear what plaintiff is referring to here.

47

only inadmissible hearsay evidence in the form of (1) her affidavit setting forth representations that Dobson allegedly made to her, and (2) an expert's opinion that plaintiff is "damaged goods." (*Id.*, citing Doc. 149 at 28, 30-31; Pltf. Aff., Doc. 140-1, ¶¶ 10-12, 15-18, 22-24).

### *1. Law of tortious interference*

"The torts of interference with business relationships and contract rights generally occur when a person, without privilege to do so, induces or otherwise purposely causes a third person not to enter into or continue a business relation with another, or not to perform a contract with another." *A & B-Abell Elevator Co. v. Columbus/Cent. Ohio Bldg. & Constr. Trades Council*, 651 N.E.2d 1283, 1294 (Ohio 1995). *See also Davila v. Simpson*, 108 N.E.3d 628, 633 (Oh. Ct. App. 2018) (quoting *Slyman v. Shipman, Dixon & Livingston, Co., L.P.A.*, No. 2008-CA-35, 2009 WL 2489333 (Oh. Ct. App. Aug. 14, 2009) (citations omitted)). To prove a claim of tortious interference with contract, the plaintiff must establish "(1) the existence of a contract, (2) the wrongdoer's knowledge of the contract, (3) the wrongdoer's intentional procurement of the contract's breach, (4) lack of justification, and (5) resulting damages. *Long v. Mt. Carmel Health System*, 93 N.E.3d 436, 445 (Oh. Ct. App. 2017) (citing *Fred Siegel Co., L.P.A. v. Arter & Hadden*, 707 N.E.2d 853, 855, syll. ¶ 1 (Ohio 1999)).

To prove lack of justification, the plaintiff must show that the defendant's interference with the third party's business relationship was improper. *Id.* (citing *Fred Siegel Co., L.P.A.*, 707 N.E.2d at syll. ¶ 2). Factors relevant to this showing are those set forth in the Restatement of the Law 2d, Torts, Section 767 (1979): "(a) the nature of the actor's conduct, (b) the actor's motive, (c) the interests of the other with which the actor's conduct interferes, (d) the interests sought to be advanced by the actor, (e) the social interests in protecting the freedom of action of

the actor and the contractual interests of the other, (f) the proximity or remoteness of the actor's conduct to the interference and (g) the relations between the parties." *Id.* at 861.

"Merely communicating a good faith opinion to another person does not rise to the level of tortious interference." *Gentile v. Turkoly*, 86 N.E.3d 991, 997-98 (Oh. Ct. App. 2017) (citing *Altier v. Valentic*, No. 2003-G-2521, 2004 WL 2376265, ¶ 18 (Oh. Ct. App. Oct. 22, 2004)). Expressions of opinion are generally protected under the Ohio constitution. *Id.* (citing *Vail v. The Plain Dealer Publ'g Co.*, 72 Ohio St. 3d 279, 281, 649 N.E.2d 182 (1995) (citing *Scott v. News–Herald*, 496 N.E.2d 699 (Ohio 1986)). To determine whether particular speech is constitutionally protected opinion, the court considers the totality of the circumstances including the specific language at issue, whether the statement is verifiable, the general context of the statement, and the broader context in which the statement was made. *Id.* (citing *Vail*, 694 N.E.2d 182, syll.).

### 2. Resolution

It is not disputed that the first two elements of an intentional interference with business relationship claim are satisfied here. First, plaintiff had an employment relationship with Wood County as of the date Gmoser called Dobson about the suit plaintiff had filed against Gmoser. Second, there is evidence that Gmoser was aware of plaintiff's employment relationship with Wood County before he contacted her employer on May 8, 2017, which is three days after she filed this lawsuit against him. (*See* Gmoser's IC ROGs, Doc. 126-5, No. 9; Gmoser's OC ROGs, Doc. 126-6, No. 9).

Plaintiff's claim must nonetheless fail because she has not produced evidence to create a genuine issue of material fact on the third and fourth elements. Plaintiff relies only on generalities and the presumed content and consequences of Gmoser's phone call to Dobson to

49

speculate that Gmoser acted improperly and without justification so as to satisfy the third and fourth elements of her claim. Plaintiff alleges that Gmoser placed an "irate call" to Dobson after Gmoser learned that plaintiff had sued him for comments Gmoser made about her to Dobson. (Doc. 140 at 6). Plaintiff alleges it is clear that Gmoser's act of placing an "irate call to Dobson," her employer, was "at the very least reckless and, at most, done with malice and ill will or revenge" because an angry call to a colleague about an employee would likely result in the employee's discharge. (*Id*. at 6-8). Plaintiff alleges the call clearly was not "innocuous" because it upset Dobson, whom Gmoser allegedly "yelled at" and questioned as to how plaintiff knew about the men's earlier private conversation. (Doc. 149 at 30-31). But none of the circumstances that plaintiff has described suggest that Gmoser did anything improper or unlawful by contacting Dobson.

Plaintiff does not allege that Gmoser actually said anything during his phone call with Dobson that was false or malicious, or that Gmoser said anything in an effort to persuade Dobson to terminate plaintiff's employment. Plaintiff simply relies on the purported emotional state and demeanor of Gmoser, a colleague of Dobson's, during the call to argue Gmoser's intent was to induce Dobson to discharge her. Plaintiff's allegations fall far short of the evidence needed to create a genuine issue of fact on whether Gmoser acted with the requisite intent under the third element of the claim. Even assuming plaintiff's allegations were supported by competent evidence, a reasonable juror could not conclude based on the facts alleged that Gmoser intentionally induced the termination of plaintiff's employment because he was "irate" when he placed the call to Dobson about plaintiff's lawsuit against him and "yelled" at Dobson during the call. Gmoser was not legally obligated to refrain from contacting Dobson to ask him how plaintiff had learned about their private conversation, which was the basis for plaintiff's

claims against him; Gmoser was not legally required to maintain his composure and to not become angry when speaking to plaintiff's employer about a matter that Gmoser could legitimately perceive to be a breach of his privacy, or about any other such matter; and Gmoser was not legally bound to withhold any negative opinions he held about plaintiff from her employer.

Finally, plaintiff has not produced evidence that raises a genuine issue of material fact on the fifth element of her claim, which is damages resulting from Gmoser's phone call. Plaintiff alleges that the phone call necessarily was the cause of her termination from her employment with Wood County because there is no other possible explanation. (Doc. 140 at 8, citing Pltf. Aff., ¶ 25; Doc. 149 at 31). She alleges that Dobson knew about the lawsuit before Gmoser's phone call but did not terminate her at that time. (Doc. 149 at 31). Instead, she claims that Dobson "complimented her and reassured her that Butler County's loss is Wood County's gain." (Doc. 140 at 7, citing Pltf. Aff., Doc. 140-1, ¶ 12).

Plaintiff's theory of causation is flawed and is based only on conjecture, speculation, and inadmissible hearsay testimony. Plaintiff's assertion that Dobson complimented her work after she informed him she had filed a lawsuit is inadmissible hearsay, and her reiteration of the statement in her affidavit does not cure the defect. *See Alexander*, 576 F.3d at 558; Fed. R. Civ. P. 56(c)(1)(A), (4) (requiring an affidavit or declaration to "set out facts that would be admissible in evidence"). Although plaintiff disputes Dobson's stated reasons for her termination - "persistent untruthfulness and . . . inability to get along with co-workers. . . ." (*see* Dobson Aff., Doc. 131-1, ¶¶ 13, 15-18, 20-22) - she has not presented competent evidence to establish an issue of fact that the reasons posited by Dobson were not the real reasons for her discharge and that the

true reason was Gmoser's phone call. Thus, plaintiff has failed to establish the fifth element of her intentional interference claim.

Plaintiff has not come forward with competent evidence that raises a genuine issue of material fact on each of the required elements of her intentional interference with a business relationship claim against Gmoser. Summary judgment should be granted in Gmoser's favor on this claim.

## E.  Discrimination claims under the Equal Protection Clause and Ohio Rev. Code § 4112.02 (Counts V & IX)

### 1.  Procedural background

Plaintiff alleges in Count V of the amended complaint that defendant Stephens violated her right to equal protection of the law under the Fourteenth Amendment to the United States Constitution by failing to provide plaintiff with a reasonable accommodation to enable her to practice her deeply-held religious beliefs. (Doc. 20, ¶¶ 103-109). Plaintiff alleges in Count IX of the complaint that defendant Stephens discriminated against her based on her religion and retaliated against her in violation of Ohio Rev. Code §§ 4112.02 and 4112.99. (*Id.*, ¶¶ 162-172). Plaintiff alleges that defendant Stephens retaliated against her in violation of the Ohio statutes by: (1) terminating her based on her request to observe the Jewish High Holidays; and (2) following her termination, providing false and negative or derogatory statements regarding plaintiff and her work performance to members of the legal community and potential employers, and encouraging and compelling defendants Gmoser and Ferguson to retaliate against plaintiff on Stephens's behalf in violation of Ohio Rev. Code § 4112.02(J). (*Id.*).

Defendant Stephens moves for summary judgment on plaintiff's claims of discrimination and retaliation brought under the Equal Protection Clause and Ohio Rev. Code § 4112.02. (Doc. 143 at 7-10). Stephens contends that plaintiff's claims fail under the Title VII disparate

treatment analysis applicable to both types of claims. (Doc. 143 at 7-9). Stephens argues that there is no evidence to show that another member of Stephens's personal staff engaged in conduct similar to plaintiff's conduct so as to satisfy the fourth prong of a prima facie case of religious discrimination. (*Id*. at 8). Stephens further argues he has articulated a legitimate, non-discriminatory reason for plaintiff's termination, which is that her personality conflicts and combative behavior created a negative work environment. (*Id*.). Finally, Stephens contends that his proffered reason for terminating plaintiff is not a pretext for discrimination. (*Id*. at 9).

Plaintiff opposes defendant's motion. (Doc. 149). Plaintiff argues that she has established a prima facie case of discrimination and she has shown that the reason proffered by defendant for her termination is a pretext for religious discrimination. (*Id*. at 5-20). In support of her equal protection claim, plaintiff contends she has come forward with evidence to show that she was treated less favorably over the course of her employment with Stephens than similarly-situated employees were treated. (*Id*. at 20-21). Plaintiff alleges that she was required to use personal time off in July 2016 when Barger and Wilson were not, and that Barger and Wilson were paid for time they allegedly spent on gaming and media websites during the work day whereas plaintiff had to work to earn her pay. (*Id*.).

In reply, defendant argues that his stated reason for terminating plaintiff - "internal conflicts between [plaintiff] and the other members of his personal staff" - stands unrebutted because only Stephens is aware of his "observations and understanding of how [plaintiff] related to other members of his personal staff." (Doc. 152 at 5, 8). Defendant argues plaintiff has not created a material question of fact on this issue, and her own perceptions of how she "got along" with other members of Stephens's staff are immaterial. (*Id*. at 9). At the same time, defendant notes that to the extent plaintiff's "perceptions of her relationships with co-workers is [sic] of

interest," plaintiff's "true views of her coworkers" are reflected in a pre-suit letter she wrote shortly after her termination and in her deposition testimony. (*Id*. at 9-10). Further, Stephens argues that his reason for terminating plaintiff has never changed. (*Id*. at 10-11). Stephens asserts that he either told plaintiff that she did not "fit in" (Doc. 149 at 7) or that "I need my office to get along and you don't fit in" (Pltf. Depo. II, Doc. 132 at 62), which was not a reference to plaintiff's religion, and he never wavered from this position and alleged that plaintiff's work performance was an issue. (Doc. 152 at 10-11). Stephens alleges he repeated his reason in the letter his attorney sent on his behalf to plaintiff's then-attorney (Doc. 149-2 at 1, 4-5) and in his EEOC affidavit (Doc. 126-10, ¶ 35). Finally, Stephens argues that plaintiff cannot show that she was treated differently than similarly-situated individuals or that she was replaced by an individual outside the protected class. (Doc. 152 at 11). Stephens contends that he hired a Jewish individual, Dan Gehr, to fill plaintiff's position. (*Id*., citing Doc. 149 at 8). Stephens argues that plaintiff's equal protection claim based on vacation time taken during the summer and time other staff allegedly spent on gaming and video sites cannot be considered because plaintiff raises the claim for the first time in her response to the motion for summary judgment. (Doc. 152 at 13-14).

### 2. Discrimination under the Equal Protection Clause and the Ohio Revised Code

The Equal Protection Clause of the Fourteenth Amendment requires that the government treat similarly-situated persons in a like manner. *City of Cleburne v. Cleburne Living Ctr.,* 473 U.S. 432, 439 (1985). The Equal Protection Clause prohibits disparate treatment that is "deliberately based upon an unjustifiable standard such as race, religion, or other arbitrary classification." *Oyler v. Boles,* 368 U.S. 448, 456 (1962). Employment discrimination claims brought under the Equal Protection Clause and Ohio Rev. Code Ch. 4112, both of which prohibit

religious discrimination in employment, are analyzed under the same standard applicable to a disparate treatment claim under Title VII. *Perrea v. Cincinnati Pub. Schools*, 709 F. Supp. 2d 628, 646 (S.D. Ohio 2010) (citing *Dews v. A.B. Dick Co.*, 231 F.3d 1016, 1021 n.2 (6th Cir. 2000) (citing *Plumbers and Steamfitters Jt. Apprenticeship Comm. v. Ohio Civil Rights Comm'n*, 421 N.E.2d 128, 131 (1981)); *Perry v. McGinnis*, 209 F.3d 597, 601 (6th Cir. 2000). The plaintiff must establish under both statutes that she was "the victim of intentional or purposeful discrimination." *Id*. (quoting *Gutzwiller v. Fenik*, 860 F.2d 1317, 1325 (6th Cir. 1988)).

A plaintiff can prove employment discrimination through either direct evidence or circumstantial evidence. Direct evidence "is that evidence which, if believed, requires the conclusion that unlawful discrimination was at least a motivating factor in the employer's actions." *Amini v. Oberlin College*, 440 F.3d 350, 359 (6th Cir. 2006) (quoting *Kocak v. Cmty. Health Partners of Ohio, Inc.*, 400 F.3d 466, 470 (6th Cir. 2005)). Where a plaintiff seeks to prove her discrimination claim through circumstantial evidence, the *McDonnell Douglas* burden-shifting framework applies. *DeNoma v. Hamilton County Ct. of Com. Pleas*, 626 F. App'x 101, 104-05 (6th Cir. 2015) (citing *Chattman v. Toho Tenax Am., Inc.*, 686 F.3d 339, 347 (6th Cir. 2012) (citing in turn *Chen v. Dow Chem. Co.*, 580 F.3d 394, 400 (6th Cir. 2009)). The plaintiff must first establish a prima facie case of religious discrimination; the burden then shifts to the employer to articulate a legitimate, non-discriminatory explanation for his actions; and then the burden shifts back to the plaintiff to identify evidence that permits a reasonable conclusion that the proffered reason is a pretext for unlawful discrimination. *Id.* At all times the burden of persuasion rests with the plaintiff. *Lindsay v. Yates*, 578 F.3d 407, 421 (6th Cir. 2009) (citing *Peters v. Lincoln Elec. Co.*, 285 F.3d 456, 470 (6th Cir. 2002)).

A plaintiff establishes a prima facie case of employment discrimination by showing that: "(1) [s]he is a member of a protected class; (2) [s]he suffered an adverse employment action; (3) [s]he was qualified for the position in question; and (4) [s]he was treated differently from similarly situated individuals outside of h[er] protected class." *Smith v. City of Salem*, 378 F.3d 566, 570 (6th Cir. 2004) (citing *Perry*, 209 F.3d at 601). Plaintiff can also establish the fourth prong of a prima facie case by showing she was replaced by someone outside of the protected class. *Mitchell v. Toledo Hosp.*, 964 F.2d 577, 582 (6th Cir. 1992). To "be considered 'similarly situated' for the purposes of [the fourth prong of the prima facie case], the employment situation of the comparator must be similar to that of the plaintiff in all relevant aspects." *Highfill v. City of Memphis*, 425 F. App'x 470, 474 (6th Cir. 2011). *See also Romans v. Mich. Dept. of Human Servs.*, 668 F.3d 826, 836 (6th Cir. 2012). The plaintiff must also show that the employees with whom she seeks to compare herself "engaged in acts of comparable seriousness." *Craig-Wood v. Time Warner N.Y. Cable LLC*, 549 F. App'x 505, 509 (6th Cir. 2014) (citations omitted).

The Supreme Court has emphasized that the *McDonnell Douglas* prima facie standard is not "inflexible" and that "the specific proof required of the plaintiff in that particular case was 'not necessarily applicable in every respect in differing factual situations.'" *Lindsay*, 578 F.3d at 416 (citing *Burdine*, 450 U.S. at 254 n.6) (quoting in turn *McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 802 n.13 (1973)). In every case of alleged discrimination, "the key question . . . is whether the plaintiffs have 'presented sufficient evidence to permit a reasonable jury to conclude [they] suffered' an adverse . . . action 'under circumstances giving rise to an inference of unlawful discrimination,' not whether the prima facie elements specifically articulated in *McDonnell Douglas* . . . could be established." *Id.* (citing *Blair v. Henry Filters, Inc.*, 505 F.3d 517, 524 (6th Cir. 2007)).

### i. Prima facie case

Stephens does not dispute that plaintiff is a member of a protected class, she was qualified for her position, and she suffered an adverse employment action. (Doc. 143 at 8). Stephens argues that the fourth prong of the prima facie case is not satisfied because no member of his staff engaged in conduct similar to that of plaintiff. (*Id.*). That is, no other member of his staff failed to "fit in" with other staff members (Pltf. Aff., Doc. 141-5, ¶ 17) and failed to "gel[]" with the rest of the staff." (*See* Stephens Aff., Doc. 126-10, ¶ 35).

In her response to defendant's summary judgment motion, plaintiff claims that Stephens denied her equal protection of the law by treating her less favorably than Stephens's judicial assistant, Barger, and his bailiff, Wilson. Plaintiff alleges that she was required to use personal time for two paid days off in July 2016 while Barger and Wilson received two to three days of paid time off during that same week without having to use personal or vacation time, and that Barger and Wilson "have approval of absence forms for paid time off around Christmas and Thanksgiving, which are their holidays."[9] (Doc. 149 at 21, citing Doc. 149-1, Exhs. 3-5). Plaintiff also contends that Barger spent time "on gaming and social media websites during the work day instead of working, while Plaintiff had to actually work to earn her pay." (*Id.*). Plaintiff alleges that the disparate treatment she was subjected to includes being "yelled at and terminated for asking to use her vacation time to observe her religion for eight days, while Barger had used <u>almost a month of work time playing online games</u>, getting paid by the county for it, and Stephens didn't even tell her to stop." (*Id.* at 22, emphasis in the original).

Although defendant Stephens objects to plaintiff's introduction of evidence relating to his staff's efficient use of work time (or lack thereof) and allowing paid time off as raising a "new"

---

[9] Plaintiff does not specify when the leave was approved, who approved the leave, or the requested leave dates.

claim or theory of relief, the Court disagrees. The evidence is relevant to the issue of alleged disparate treatment in violation of plaintiff's right to equal protection. Defendant had sufficient notice of plaintiff's disparate treatment claim under the Equal Protection Clause. (*See* Doc. 20, ¶¶ 103-109).

Plaintiff has presented evidence suggesting that she was treated less favorably than the two other staff members in Stephens's office. Defendant argues that his staff was not similarly situated to plaintiff because "no other member of his personal staff engaged in conduct similar to that of Edelstein." (Doc. 143 at 6). However, Stephens reads the similarly-situated requirement of the prima facie case too narrowly. The Sixth Circuit has stated that courts:

> should make an independent determination as to the relevancy of a particular aspect of the plaintiff's employment status and that of the non-protected employee. The plaintiff need not demonstrate an exact correlation with the employee receiving more favorable treatment in order for the two to be considered "similarly-situated;" rather, . . . the plaintiff and the employee with whom the plaintiff seeks to compare himself or herself must be similar in all of the *relevant* aspects.

*Ercegovich v. Goodyear Tire & Rubber Co.*, 154 F.3d 344, 352 (6th Cir. 1998) (emphasis in the original) (internal quotation and citation omitted).

In addition, defendant's vague and subjective reason for terminating plaintiff - that she did not "fit in" or get along with the two other members of his staff - must be viewed in the context of a small, personal staff of three employees. Stephens alleges he observed tension and strife among his personal staff. Given the interrelationships of a small staff working in close proximity to one another, the three members of this small working group are necessarily similarly situated in terms of interpersonal conflicts. A reasonable jury could find that plaintiff and Stephens's other staff members were similarly situated in this regard.

Even if plaintiff were unable to meet the fourth prong of the *McDonnell Douglas* framework in the usual ways – by showing she was replaced by an individual who was not

Jewish or was treated less favorably than similarly-situated employees – plaintiff is not foreclosed from proving she was terminated based on her religion. The Sixth Circuit has stated that "the *prima facie* inquiry 'was never intended to be rigid, mechanized, or ritualistic. Rather, it is merely a sensible, orderly way to evaluate the evidence in light of common experience as it bears on the critical question of discrimination.'" *Lindsay*, 578 F.3d at 417 (quoting *Irvin v. Tenn.*, 826 F.2d 1063, *3 n.4 (6th Cir. Aug. 20, 1987) (Table) (quoting *Furnco Const. Corp. v. Waters*, 438 U.S. 567, 577 (1978)). As "long as 'additional evidence' exists - beyond showing the first three elements of the *McDonnell Douglas* test - that indicates discriminatory intent in 'light of common experience,' the required 'inference of discrimination' can be made in satisfaction of the *prima facie* case. This holds true even if the plaintiff is not necessarily able to identify similarly-situated individuals outside of the relevant protected group who were treated more favorably." *Id*. at 418. This "additional evidence" to satisfy the prima facie case depends upon the particular facts and circumstances of the given case. *Id*. (citing *Blair, Inc.*, 505 F.3d at 529 (citing cases that "merely [offered] various context-dependent ways by which plaintiffs *may* establish a *prima facie* case, and [did] not [establish] rigid requirements that all plaintiffs with similar claims must meet regardless of context"), *overruled on other grounds, Gross v. FBL Fin. Servs. Inc.*, 557 U.S. 167 (2009)). Thus, in *Lindsay*, a case in which the Sixth Circuit analyzed the *McDonnell Douglas* framework in the housing discrimination context, the Court of Appeals determined that the suspicious timing of the termination of a purchase agreement, within a few days after the seller discovered the buyers were African American, provided a sufficient evidentiary basis for inferring the seller acted with a racially discriminatory motive. *Id.* at 419-20.

In this case, plaintiff alleges that she was discriminated against because she was a

Sabbath-observant Jew who requested several days off work in accordance with her religious faith and practices. As in *Lindsay*, the evidence in this case - the suspicious timing between plaintiff's request for eight days off in October 2016 to observe the Jewish High Holy Days, Stephens's exclamation of "Holy Cow!," and Stephens's decision to terminate plaintiff almost immediately - considered in the light most favorable to plaintiff and in view of the remaining evidence of record, is sufficient to permit a reasonable jury to conclude that plaintiff suffered "an adverse . . . action 'under circumstances giving rise to an inference of unlawful discrimination.'" *Lindsay*, 578 F.3d at 416. Stephens is not entitled to summary judgment on the ground plaintiff cannot establish the fourth prong of her prima facie case of discrimination based on her religion.

### ii. Articulated non-discriminatory reason and pretext

Stephens also argues that he has articulated a legitimate, non-discriminatory reason for plaintiff's termination, i.e., "the negative work environment created by personality conflicts and combative behavior." (Doc. 143 at 6). Stephens alleges that the "indisputable evidence in this case, including from [plaintiff] herself, reveals that she had a problem getting along with co-workers, and Stephens truthfully told her that she was being fired for this precise reason." (*Id.* at 10).

Stephens argues that plaintiff cannot demonstrate that his reasons for firing plaintiff are a pretext for discrimination. (*Id.* at 9, citing *Glasstetter v. Rehab. Servs. Comm'n,* No. 2:07-cv-125, 2010 WL 2465356, at *8 (S.D. Ohio June 14, 2010) (quoting *Smith v. Chrysler Corp.*, 155 F.3d 799, 805-06 (6th Cir. 1998)). Stephens asserts that the evidence shows he "reasonably relied on the particularized facts before [him] at the time [he] made the employment decision." (*Id.*, citing *Smith*, 155 F.3d at 807). Stephens concedes that he did not address "each reported instance of conflict" with plaintiff. (*Id.* at 9). However, he alleges the "indisputable evidence . .

. reveals that she had a problem getting along with co-workers, and Stephens told her that she was being fired for this precise reason." (*Id*. at 10). Stephens alleges that the "cumulative effect of 'repeated complaints' of the 'other members of his personal staff' [about] plaintiff's attitude toward" them, which had "evolved once [plaintiff] arrived," and "his own frustration with her attitude," led Stephens to believe "the working relationship among his personal staff members had grown toxic and that [plaintiff] was the root cause." (*Id.*). As evidence for this conclusion, Stephens points to (1) plaintiff's "response to being terminated," which he claims was to "blame her co-workers, accusing them of not performing their own work and labeling them as the reason for her termination" (*Id.*); (2) plaintiff's "paragraph-by-paragraph response" to a letter Stephens's counsel sent in response to a settlement demand made on plaintiff's behalf by her then-attorney, which Stephens claims evidenced animosity between plaintiff and him and conflicts with Barger and Wilson (*Id.*, citing Doc. 131-1 at 30, Exh. 3); and (3) plaintiff's deposition testimony, in which she characterized Stephens, Barger, and Wilson as "juvenile" and "unprofessional" (Pltf. Depo. I, Doc. 131 at 58-59, 72-73, 111-13; Pltf. Depo. II, Doc. 132 at 89-90, 98-100).

Plaintiff argues that Stephens's articulated reason for terminating her is pretextual on three primary grounds: (1) the reason for the termination is inconsistent; (2) the reason is implausible; and (3) the reason is not supported by evidence. (Doc. 149 at 10-18). Plaintiff alleges that Stephens informed her when he terminated her that the reason was because she did not "fit in" (Stephens's RFAs, Doc. 126-8, No. 29); her termination letter did not include a reason (Pltf. Aff., Doc. 149-1, ¶ 9; *Id.*, Exh. 2); and Stephens informed plaintiff when he terminated her that she could apply for unemployment and he would not contest it. (Doc. 149 at 11, citing Pltf. Depo. I, Doc. 131 at 172).

A plaintiff may show pretext by demonstrating: "(1) that the proffered reasons had no basis in fact, (2) that the proffered reasons did not actually motivate [the adverse employment action], or (3) that they were insufficient to motivate [the adverse employment action]." *Hedrick*, 355 F.3d at 460. *See also Chen,* 580 F.3d at 400. The test is not a "rigid" one, and "it is important to avoid formalism in its application, lest one lose the forest for the trees." *Id.* (quoting *Chen*, 580 F.3d at 400 n.4). "[A] prima facie case [of discrimination] and sufficient evidence to reject the employer's explanation may permit a finding of liability," so that plaintiff need not "introduce additional, independent evidence of discrimination" to get past summary judgment. *Id.* (quoting *Reeves*, 530 U.S. at 149). "Pretext is a commonsense inquiry: did the employer fire the employee for the stated reason or not?" *Chen,* 580 F.3d at 400 n.4.

Plaintiff has come forward with sufficient evidence to create a genuine issue of material fact on the question of pretext. First, rather than articulating a "clear and specific" legitimate nondiscriminatory reason for plaintiff's termination which would give plaintiff a "full and fair opportunity" to show pretext, defendant has given a vague and subjective reason for discharging plaintiff. *See Grano*, 699 F.2d at 837 (quoting *Burdine*, 450 U.S. at 253). The more subjective the alleged reason for the adverse employment decision, "the more closely [the court] must scrutinize [defendant's] proffered rationales." *Kimble*, 439 F. App'x at 497 (citing *Grano,* 699 F.2d at 837) ("[T]he legitimacy of the articulated reason for [an] employment decision is subject to particularly close scrutiny where the evaluation is subjective.")). Defendant Stephens's vague and highly subjective reasons for terminating plaintiff - i.e., she did not "fit in" or "she could not 'get along' with the other members of his staff" - warrant close scrutiny to determine whether those reasons were a pretext for unlawful discrimination.

The evidence, considered as a whole, is sufficient to permit an inference that the

subjective reasons Stephens gave for plaintiff's termination are pretextual. Why Stephens thought that plaintiff did not "fit in" with his personal staff is not clear from the record. Stephens asserts that plaintiff caused conflicts with him and with staff within two months of her hiring, but Stephens does not cite evidence to show he raised this issue with plaintiff at that time or at any other point in plaintiff's employment. (*See* Doc. 143 at 6-7). Stephens never documented incidents or issues that indicated plaintiff was the source of friction or strife and that suggest she created a negative work environment in his chambers. Prior to her termination, plaintiff never had a conversation with Stephens about problems getting along with Barger or Wilson (Doc. 149 at 5, citing Pltf. Aff., Doc. 149-1, ¶ 2), and she never spoke with Barger while the two worked together about communication issues or difficulties getting along with each other (*Id.*, ¶ 3). Plaintiff had no written reprimands from Stephens in her employment file from March 14, 2016 to August 1, 2016. (Pltf. Aff., Doc. 141-5, ¶ 18). Stephens admits that he never gave plaintiff a verbal or written reprimand about her conduct in chambers, and he never spoke to plaintiff about conflicts with Barger, about "butting heads" with Barger, about allegedly "barking orders" to Barger, about purportedly demanding the scheduling book from Barger, or about the reason plaintiff closed her office door. (Stephens OC RFAs, Doc. 126-8, Nos. 5, 9, 10, 15, 17, 26). Based on the highly subjective and vague reasons Stephens gave for plaintiff's discharge, coupled with Stephens's failure to raise or address plaintiff's workplace conduct and demeanor prior to her discharge, a reasonable jury could find that Stephens used the excuse that plaintiff did not "fit in" to mask a discriminatory intent.

In addition, plaintiff has presented evidence that calls into question the veracity of Stephens's assertion that "she could not 'get along' with the other members of [Stephens's] staff" as defendant alleges. (*See* Doc. 149 at 10-18). To resolve the conflicting evidence on this

issue, credibility determinations must be made, which is beyond the province of the Court on summary judgment. *Reeves*, 530 U.S. at 150. Thus, there are issues of fact as to whether Stephens's articulated reasons for terminating plaintiff's employment are pretextual.

### *iii. Conclusion*

Stephens argues that even if plaintiff could carry her ultimate burden to show her religious faith or the exercise of her religious freedom was a motivating factor in her termination, she cannot prevail because "it is undisputed that the government [Stephens] would have made the same decision regardless." (Doc. 143 at 10, citing *Tex. v. Lesage*, 528 U.S. 18, 21 (1999) ("The government can avoid liability by proving that it would have made the same decision without the impermissible motive.")). Stephens asserts he has testified that he did not consider plaintiff's faith or time-off request in his decision to fire her, and plaintiff has presented only her suspicions to dispute that evidence. (*Id.*). For the reasons discussed *supra*, there are questions of fact underlying resolution of the ultimate issue of whether Stephens's decision to terminate plaintiff was motivated in whole or in part by plaintiff's exercise of her religion. Stephens is not entitled to summary judgment on plaintiff's discrimination claims under Counts V and IX.

### F. Defamation claim against defendant Stephens (Count XV)

#### *1. Procedural background*

Plaintiff brings a defamation claim against defendant Stephens. (Doc. 20, ¶¶ 245-262). Plaintiff claims in the amended complaint that between August 1, 2016 and September 20, 2016, Stephens made statements to attorneys and fellow judges that plaintiff "was a poor employee," she "destroyed work product," she "procrastinated," she "failed to perform assigned tasks" and she "abused co-workers and/or caused disturbances at work." (*Id.*, ¶ 246). Plaintiff claims that during this same time period, Stephens made statements to his attorney, Linda Woeber, that

plaintiff "had a temper and caused disturbances at work," she "procrastinated," she "missed deadlines," and she "was a poor employee." (*Id.*, ¶ 247). Plaintiff alleges that on August 1, 2016, Stephens told her colleague, Magistrate Matt Reed, and staff in the Court Administration Office that "he needed coverage for plaintiff's docket because he was terminating Plaintiff's employment." (*Id.*, ¶¶ 248-249). Plaintiff alleges that upon information and belief, between August 1, 2016 and April 1, 2017, Stephens "made knowingly false statements that [she] was a poor employee to several potential employers. . . ." (*Id.*, ¶ 254). Plaintiff alleges that upon information and belief, "Stephens' statements, made in his official capacity, to court staff regarding Plaintiff's sudden termination, falsely implied that [she] was guilty of serious misconduct," and his "statements to court staff, attorneys, and judges were false" and falsely implied that plaintiff "was guilty of serious misconduct." (*Id.*, ¶¶ 250- 252). Plaintiff alleges that upon information and belief, these false statements about her "work performance and behavior on the job" damaged her personal and professional reputation and caused her extreme emotional distress, prevented her from obtaining new employment, and caused her extreme financial hardship. (*Id.*, ¶¶ 256-257).

## 2. *Ohio law of defamation*

"Defamation is a false publication that injures a person's reputation, exposes h[er] to public hatred, contempt, ridicule, shame, or disgrace, or affects h[er] adversely in h[er] trade or business." *Konica Minolta Bus. Sols, U.S.A., Inc. v. Allied Office Prods.*, 724 F. Supp. 2d 861, 868 (S.D. Ohio 2010) (citing *Sweitzer v. Outlet Comm's, Inc.*, 726 N.E.2d 1084, 1088 (Ohio Ct. App. 1999)). To establish her defamation claim, plaintiff must prove there was: "(1) a false and defamatory statement; (2) about plaintiff; (3) published without privilege to a third party; (4) with fault or at least negligence on the part of the defendant; and (5) that was either defamatory

per se or caused special harm to the plaintiff." *Id.* (citing *Davis v. Jacobs*, 719 N.E.2d 1185, 1186 (Ohio Ct. App. 1998)). The court decides as a matter of law whether the statement alleged to be defamatory is actionable. *Am. Chem. Soc'y v. Leadscope, Inc.*, 978 N.E.2d 832, 853 (Ohio 2012) (quoting *Yeager v. Local Union 20, Teamsters, Chauffeurs, Warehousemen & Helpers of Am.*, 6 Ohio St. 3d 369, 372, 453 N.E.2d 666, 669 (Ohio 1983)).

If a statement can be reasonably interpreted in "both a defamatory and an innocent way," the court must apply the "innocent construction rule." *Konica Minolta*, 724 F. Supp. 2d at 871 (quoting *Kanjuka v. MetroHealth Med. Ctr.*, 783 N.E.2d 920, 928 (Oh. Ct. App. 2002)). Under the rule, the court must accept the innocent meaning and recovery is barred. *McKimm v. Ohio Elections Comm.*, 729 N.E.2d 364, 372 (Ohio 2000).

Ohio law provides that a communication is absolutely privileged when: "(1) made in the regular course of preparing for and conducting a proceeding that is contemplated in good faith and under serious consideration, (2) pertinent to the relief sought, and (3) published only to those directly interested in the proceeding." *Morrison v. Gugle*, 755 N.E.2d 404, 416 (Oh. Ct. App. 2001) (citing *Michaels v. Berliner*, 694 N.E.2d 519, 522-23 (Oh. Ct. App. 1997); *Theiss v. Scherer*, 396 F.2d 646 (6th Cir. 1968)).

### 3. Stephens's alleged defamatory statements

Stephens argues that plaintiff has not produced evidence to show he made defamatory statements as a matter of law. Defendant separates plaintiff's defamation claim into four categories:

1) Statements Stephens allegedly made to attorneys and fellow judges between August 1 and September 2016 that plaintiff was "a poor employee," she "destroyed work product," she procrastinated, she "failed to perform assigned tasks," and she "abused co-workers, and/or she caused disturbances at work."

2) Statements Stephens made to his attorney between August 1, 2016 and September 20,

2016 that "plaintiff had a temper and caused disturbances at work," she procrastinated, she missed deadlines, and she was "a poor employee."

3) A statement Stephens made on August 1, 2016, to Butler County Common Pleas Magistrate Matt Reed and the Court's administration office that "he needed coverage of Plaintiff's docket because he was terminating her employment."

4) Statements Stephens made to several of plaintiff's potential employers between August 1, 2016 and September 20, 2016, which were knowingly false.

(Doc. 143 at 15).

Stephens argues that: 1) there is no evidence that he made the first set of statements; (2) the second group of statements is based on speculation that Stephens lied to his attorney during attorney-client settlement discussions, it includes statements that Stephens made to his attorney for the purpose of seeking legal advice and which were privileged, and the confidential settlement letter is not a "publication" on which a defamation claim can be based; (3) Stephens admits he told someone other than Magistrate Reed that he needed coverage for plaintiff's docket because he was terminating her employment, but the statement cannot support a defamation claim as a matter of law because it was true; and (4) plaintiff conceded at her deposition (Pltf. Depo. 1, Doc. 131 at 187-88) that she has no evidence to refute Stephens's claim that he has never spoken to potential employers about plaintiff (Stephens Aff., Doc. 126-10, ¶ 39, Stephens IC ROGs,, Doc. 126-10, No. 21). Stephens also alleges that he is entitled to statutory immunity on this claim under Ohio Rev. Code § 2744.03(A)(6). (Doc. 143 at 21).

Plaintiff contends she has raised a genuine issue of material fact as to whether Stephens made actionable defamatory statements. (Doc. 149 at 22-24). Plaintiff alleges that attorney Tim Carlson told her that he appeared for a status report for Stephens and all the files with proposed judgment entries were cleared out of her office, and Carlson had been told that plaintiff had thrown the judgment entries out (Pltf. Aff., Doc. 149-1, ¶¶ 22-23); Stephens's assertion that he

did not speak to Magistrate Reed about her termination before she was discharged is not true because Stephens informed plaintiff that he did so and asked him to cover the magistrate's docket on August 1, 2016 (*Id.*, ¶ 26); it is obvious to plaintiff that Stephens gave two unidentified court administration personnel the impression that she "had done something bad to be suddenly terminated" because they stopped her in the hallway after she was terminated and wanted to know what she "had done to be terminated" (*Id.*, ¶ 27); Judge Spaeth and Judge Powers testified at their depositions that the judges discussed her termination at the judges' meeting, the judges received updates on plaintiff's allegations and litigation, and the September 1, 2016 letter drafted by plaintiff's then-counsel was discussed at the meeting; and Yates testified at his deposition that he spoke to Stephens about the discrimination allegations and plaintiff's termination. (Doc. 149 at 23-24).[10] Plaintiff also contends she has proven through the testimony of court personnel that "at least two of Stephens's statements to his attorney were false," and she has provided "ample credible evidence to dispute allegations regarding Plaintiff's conduct and work habits." (*Id.* at 24).

In reply, Stephens contends that plaintiff has not produced any evidence to support a claim of defamation against him. (Doc. 152 at 16-18). Stephens asserts that the evidence in the record shows only that Stephens responded to a question by an attorney, Tom Erven, during a job interview as to why he terminated plaintiff by telling Erven the reason was personality conflicts between plaintiff and the rest of the judge's staff. (Doc. 152 at 16). Stephens contends that plaintiff's defamation claim must be dismissed to the extent she claims "slander by implication" because Ohio law does not recognize such a claim, and a defamation claim cannot rest upon true

---

[10] Plaintiff also makes several allegations about Judge Powers's alleged demeanor and conduct at her deposition and about his reaction to being served with a subpoena issued by plaintiff. (Doc. 149 at 123-24). These allegations have no relevance to plaintiff's defamation claim and the Court has not considered them.

statements as a matter of law. *Kerr v. Hurd*, 694 F. Supp. 2d 817, 831 (S.D. Ohio 2010) (citing *Osborn v. Knights of Columbus*, 401 F. Supp. 2d 822, 828 (N.D. Ohio 2005)). Stephens asserts that neither Judge Spaeth nor Judge Powers testified that Stephens's attorney's letter was shared with the other judges in the court. (Spaeth Depo., Doc. 135 at 24-25; Powers Depo., Doc. 134 at 30-31; Powers Depo., Doc. 134-1, Exh. 3).

### i. Alleged defamatory statements to attorneys and fellow judges

Plaintiff has not produced evidence that creates a genuine issue of material fact as to whether Stephens made defamatory statements to attorneys and fellow judges about her work performance and interactions with co-workers. Stephens denies that he made the statements that plaintiff attributes to him. (Doc. 143 at 16, citing Stephens OC ROGs, Doc. 126-10, Nos. 4, 5, 7, 8, 11, 14; Stephens IC ROGS, Doc. 126-9, Nos. 3, 14, 17, 21, 23; Stephens OC RFAs, Doc. 126-8, No. 36; Stephens IC RFAs, Doc. 126-7, Nos. 25-28; Stephens Aff., Doc. 126-10, ¶ 39).

Plaintiff relies on the following evidence to show that Judge Stephens told attorneys and fellow judges that she was terminated for poor work performance: (1) plaintiff's deposition testimony that Tim Carlson and an unnamed Columbus attorney told plaintiff they "appeared for status reports and were told that I had destroyed work product and wasn't managing the files properly" or "some criticism about my files" (Pltf. Depo. I, Doc. 131 at 180-181); (2) a letter plaintiff received from the Ohio Bureau of Unemployment Compensation (*Id.*, Exh. 13, ¶ 10); and (3) the letter Stephens's counsel sent on his behalf in response to a settlement demand letter from plaintiff's then-counsel (Doc. 149-2 at 1-5).[11] (Pltf. Depo. I, Doc. 131 at 180). The facts plaintiff alleges in support of her defamation claim are not borne out by the evidence.

---

[11] The letter will be considered in connection with the second category of alleged defamatory statements.

First, plaintiff only speculates that it was Judge Stephens who told Carlson and the unidentified attorney that she threw away everything in her office, which presumably included judgment entries that were missing in the attorneys' cases. Plaintiff testified:

> Tim Carlson called me and told me that my office was empty, and he was missing judgment entries, and he was told that I -- the status report was not going forward. I had been terminated. And that I cleaned out my office and threw everything out.

(Pltf. Depo. II, Doc. 132 at 81). Plaintiff surmised at her deposition that she "*believe[s]* it was Stephens" who made these statements to attorney Carlson because a status report "would have been in front of" Stephens. (Pltf. Depo. I, Doc. 131 at 181-82). But plaintiff conceded she did not know whether Stephens actually made these statements, and she did not testify that Judge Stephens or anyone else told the attorneys that she had "destroyed work product." (*See Id.* at 184-85). Plaintiff's speculative deposition testimony is not evidence that the Court can consider on summary judgment. *See Hedberg*, 47 F.3d at 932 ("Speculation does not create a *genuine* issue of fact. . . ."). Moreover, Carlson's alleged statements cannot be considered on summary judgment because they are hearsay (Stephens's alleged out-of-court statements) within hearsay (Carlson's out-of-court statements). While there is an exception to the hearsay rule under Fed. R. Evid. 801(d)(2) for out-of-court statements made by Stephens, an opposing party, plaintiff has not identified an exception to the hearsay rule for Carlson's out-of-court statements, which plaintiff presents for the truth of the matter asserted.

Second, the letter from the unemployment bureau does not support plaintiff's claim. (Doc. 131, Exh. 13). Plaintiff testified at her deposition that after she made a claim for unemployment benefits, she received a letter from the unemployment bureau which allegedly stated that the "reason for termination given by the employer was poor work performance." (Pltf. Depo. I, Doc. 131 at 176). Plaintiff testified that Stephens alleged to the bureau that the

reason for her termination was "poor work performance" and that it was "relayed to me from a determination by this state entity [unemployment bureau] that that was their impression, too." (*Id*. at 179-181). However, plaintiff did not produce any documentation that supported her allegation. (*Id.* at 174-180). The only documentation plaintiff produced showed that the state agency relied on information that was provided by Yates, not Stephens. (Doc. 131, Exh. 13, ¶ 10). Yates explained the reason for separation as follows:

> Claimant was previously employed by a judge who retired and on 3/1/16 a new judge brought his own staff with him and advised claimant that she would need to cooperate with his staff and prove her abilities to him. When the situation appeared to be incompatible for the Judge she was discharged.

(*Id.*). Yates further explained:

> On 7/19/16 the Judge determined that claimant wasn't compatible with his other staff and things were not working out between them. Disputes arose among staff over the division of work responsibility.

(*Id.*, ¶ 16). Finally, Yates wrote:

> The Judge (supervisor) related to me that the employee was "just not working out" for him after observing her work for five months and receiving complaints from other staff.

(*Id.*, ¶ 26). Read in conjunction with the other information the unemployment bureau provided to plaintiff, the information sheet completed by Yates does not support a reasonable inference that Stephens gave "poor" or "unsatisfactory" work performance as the reason for plaintiff's separation. Plaintiff has not produced any other evidence to show that Stephens made defamatory statements about her to attorneys or fellow judges.

### ii. Statements in letter exchanged between counsel for the parties

Stephens alleges that the letter Stephens's counsel sent on his behalf in response to plaintiff's settlement demand letter is not competent evidence that Stephens made defamatory comments to attorneys and fellow judges. (Doc. 143 at 16-17). Stephens argues that plaintiff's

claim is based on her subjective belief that Stephens must have lied to his attorney during attorney-client discussions, which is speculative; the statements are privileged because Stephens made them to Woeber for the purpose of seeking legal advice; and a confidential settlement letter is not a publication on which a defamation claim can be based. (*Id.*).

Plaintiff has not cited any authority for the proposition that statements made to counsel and relayed in response to a settlement demand are not privileged. Further, there is no evidence that the letter was published to third parties. Butler County Common Pleas Judges Powers and Spaeth testified that they did not hear Stephens say anything about plaintiff beyond the fact that he terminated her, and neither testified that they were privy to the Woeber letter. Judge Spaeth testified that he had not seen the letter and he could not recall that the letter had ever been discussed at a judges' meeting. (Spaeth Depo., Doc. 135 at 17-25, 36-37). Because there is no evidence that the Woeber letter was sent to plaintiff's counsel outside the context of her settlement demand and no evidence that Stephens published the letter to third parties, the statements in the letter do not support a defamation claim against Stephens as a matter of law.

### iii. *Alleged statement to Magistrate Reed*

Accepting as true for purposes of this motion that Stephens told Magistrate Reed that he was going to terminate plaintiff, his statement was true and therefore is not defamatory as a matter of law. *See Kerr*, 694 F. Supp. 2d at 830. Assuming Stephens told Magistrate Reed that he would need coverage for the docket, this statement is not a false assertion about plaintiff. The alleged statements that Stephens made to Reed do not support a defamation claim.

#### iv.  *Alleged defamatory statements to potential employers*

Stephens denies that he ever spoke with potential employers about plaintiff. (Stephens Aff., Doc. 126-10, ¶ 39; Stephens IC ROGs, Doc. 126-9, No. 21). Plaintiff has not addressed this allegation in her response and has not come forward with any evidence to support it.

#### v.  *Conclusion*

Defendant Stephens disputes that he published defamatory statements about plaintiff to third parties. Plaintiff has not introduced competent evidence that raises a genuine issue of material fact on her defamation claim. Defendant Stephens is entitled to summary judgment on plaintiff's defamation claim against him (Count V).

### G.  Defendants' assertions of qualified and statutory immunity

Defendants assert they are entitled to qualified immunity on plaintiff's substantive due process claims. (Doc. 143 at 20-21; Doc. 148 at 10; Doc. 152 at 19-20). Defendants Gmoser and Stephens contend they are entitled to statutory immunity on plaintiff's tort claims of defamation and intentional interference with a business relationship under Ohio Rev. Code § 2744.03(A)(6) because there is no evidence they acted maliciously, in bad faith, wantonly, or recklessly. (Doc.143 at 21; Doc. 148 at 10; Doc. 152 at 20). Because the Court has determined there is no genuine issue of material fact and that defendants are entitled to judgment as a matter of law on these claims, the Court need not address defendants' assertions of qualified and statutory immunity.

### H.  Plaintiff's requests for injunctive relief and punitive damages

In Count I of the amended complaint, plaintiff seeks injunctive relief under 42 U.S.C. § 2000e-16, § 1983, and Ohio law to prohibit defendants from "continuing to disparage [her] professional reputation." (Doc. 20 at ¶¶ 63-67). Plaintiff alleges that she was discriminated

against and that defendants committed defamation by "negatively commenting about Plaintiff to [her] potential employers," which she claims injured her and her career. (*Id.*, ¶¶ 64-65). Plaintiff requests an injunction enjoining "Defendants, their successors, employees, attorneys, or any other person acting on behalf of any of them from speaking to third parties who contact them for an employment reference or otherwise negatively commenting on Plaintiff's professional reputation to members of the legal community." (*Id.* at 44). Plaintiff also seeks to recover punitive damages. (*Id.* at 45).

Defendants contend they are entitled to summary judgment on plaintiff's claim for injunctive relief because they have not engaged in acts that defamed plaintiff or disparaged her reputation. (Doc. 143 at 22). They allege they are entitled to summary judgment on plaintiff's claim for punitive damages because plaintiff has not produced evidence to show that defendants "acted maliciously or that their conduct constitutes aggravated or egregious fraud." *Id.* (citing *Wright v. County of Franklin*, 881 F. Supp. 2d 887, 914 (S.D. Ohio 2012); Ohio Rev. Code § 2315.21(C)(1) (claimant must prove actual malice by clear and convincing evidence, or show aggravated or egregious fraud, to recover punitive damages on an Ohio tort claim).

Plaintiff's claim for injunctive relief is premised on her substantive due process and Ohio tort claims. As the Court recommends summary judgment be granted for defendants on these claims, defendants are likewise entitled to summary judgment on plaintiff's Count I claim for injunctive relief.

Plaintiff's prayer for relief for punitive damages is a remedy and not a separate cause of action. *See Copen v. Noble Cty.*, No. 2:13-cv-00610, 2016 WL 687593, at \*18 (S.D. Ohio Feb. 19, 2016). *See also King v. Storm*, No. 6:15-cv-00172, 2017 WL 2174959, at \*10 (E.D. Ky. May 17, 2017). If the District Judge adopts the recommendation to deny defendants' motion for

summary judgment on plaintiff's First Amendment and Equal Protection claims, the punitive damages remedy remains an issue for jury determination at trial. "Punitive damages may be awarded in a § 1983 action when a defendant's conduct is shown to be motivated by evil motive or intent, or when it involves reckless or callous indifference to the federally protected rights of others." *Cummerlander v. Patriot Preparatory Acad. Inc.*, 86 F. Supp. 3d 808, 831 (S.D. Ohio 2015) (citing *Wilson v. Columbus Bd. of Educ.,* 589 F. Supp. 2d 952, 973 (S.D. Ohio 2008) (in turn citing *Smith v. Wade,* 461 U.S. 30, 56 (1983)). The same evidence that would allow a jury to infer that defendant Stevens discriminated against plaintiff based on her religious beliefs would allow a reasonable jury to find that defendant did so "intentionally" or with "callous indifference" to her rights, thereby raising a genuine issue of fact on the question of punitive damages. As there are genuine issues of material fact on plaintiff's First Amendment and equal protection claims, summary judgment should not be granted on any punitive damages request.

## IT IS THEREFORE RECOMMENDED THAT:

- Plaintiff's first motion for partial summary judgment (Doc. 140) on Counts VII and VIII of the amended complaint (§ 1983 claims for violations of plaintiff's Fourteenth Amendment right to substantive due process against defendants Gmoser and Ferguson) and Count XIX (state law claim for intentional interference with a business relationship against defendant Gmoser) be **DENIED**.

- Plaintiff's second motion for partial summary judgment (Doc. 141) on Count VI of the amended complaint (§ 1983 claim for violation of plaintiff's Fourteenth Amendment right to substantive due process against defendant Stephens) be **DENIED**.

- Defendants' motion for summary judgment on all claims remaining in the case (Doc. 143) be **GRANTED** in part on the following claims: (1) Count I for injunctive relief; (2) Counts VI, VII, and VIII (§ 1983 claims against defendants Stephens, Gmoser, and Ferguson for violation of plaintiff's Fourteenth Amendment right to substantive due process); (3) Count XIX (state law claim against Gmoser for intentional interference with a business relationship); and (4) Count XV (state law claim defamation claim against defendant Stephens).

- Defendants' motion for summary judgment (Doc. 143) be **DENIED** in part on the following claims brought against defendant Stephens: (1) Count III (§ 1983 claim for violation of plaintiff's rights under the Free Exercise Clause of the First Amendment); (2) Count V (§ 1983 claim for violation of plaintiff's Fourteenth Amendment right to equal protection of the law); and (3) Count IX (state law claim for unlawful termination based on religious discrimination in violation of Ohio Rev. Code §§ 4112.02 and 4112.99).

- Defendants' motion for summary judgment (Doc. 143) be **DENIED** as to plaintiff's request for punitive damages.

Date: 8/5/19

Karen L. Litkovitz
United States Magistrate Judge

# UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF OHIO
### WESTERN DIVISION

KIMBERLY EDELSTEIN,
    Plaintiff,

Case No. 1:17-cv-305
Barrett, J.
Litkovitz, M.J.

vs.

JUDGE GREG STEPHENS, *et al.*,
    Defendants.

## NOTICE

Pursuant to Fed. R. Civ. P. 72(b), **WITHIN 14 DAYS** after being served with a copy of the recommended disposition, a party may serve and file specific written objections to the proposed findings and recommendations. This period may be extended further by the Court on timely motion for an extension. Such objections shall specify the portions of the Report objected to and shall be accompanied by a memorandum of law in support of the objections. If the Report and Recommendation is based in whole or in part upon matters occurring on the record at an oral hearing, the objecting party shall promptly arrange for the transcription of the record, or such portions of it as all parties may agree upon, or the Magistrate Judge deems sufficient, unless the assigned District Judge otherwise directs. A party may respond to another party's objections **WITHIN 14 DAYS** after being served with a copy thereof. Failure to make objections in accordance with this procedure may forfeit rights on appeal. *See Thomas v. Arn*, 474 U.S. 140 (1985); *United States v. Walters,* 638 F.2d 947 (6th Cir. 1981).